

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00261-CV

IN THE INTEREST OF G.H., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-98128J-13

----------

## CONCURRING AND DISSENTING MEMORANDUM OPINION[1] ON GUARDIAN/ATTORNEY AD LITEM'S AND INTERVENORS' MOTIONS FOR EN BANC RECONSIDERATION

----------

### I. INTRODUCTION

I concur with the en banc majority opinion's affirmance of the trial court's judgment terminating Father's parental rights. I must respectfully dissent, however, from the en banc majority's affirmance of the trial court's judgment terminating Mother's parental rights to her daughter, G.H.; the evidence is

---

[1] *See* Tex. R. App. P. 47.4.

factually insufficient to support the jury's finding that terminating Mother's parental rights to G.H. is in G.H.'s best interest. *See In re G.H.*, No. 02-14-00261-CV, 2015 WL 602585, at *43 (Tex. App.—Fort Worth Feb. 12, 2015, no pet. h.) (mem. op.) (holding the evidence in this case factually insufficient to support the finding that termination of Mother's parental rights to G.H. is in G.H.'s best interest).[2]

## II. INTERVENORS FAILED TO MEET THEIR BEST-INTEREST BURDEN

Parents' rights to "the companionship, care, custody[,] and management" of their children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982). There is a strong presumption that keeping G.H. with Mother is in G.H.'s best interest. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Mother's parental rights to G.H. cannot be terminated merely because Intervenors (Mother's sister and her husband) might be better and more prosperous parents. *See In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.).

Here, the Department of Family and Protective Services did not seek termination of Mother's parental rights to G.H.;[3] consequently, Intervenors were required to prove by clear and convincing evidence that termination of Mother's parental rights to G.H. was in G.H.'s best interest. *See In re E.N.C.*, 384 S.W.3d

---

[2]A copy of this opinion is attached as Appendix A.

[3]The Department believed Mother was doing well with the monitored return of G.H. and asked the jury not to terminate Mother's parental rights to G.H.

796, 807 (Tex. 2012) (holding evidence legally insufficient to support finding that termination was in child's best interest). They failed to meet this burden.

The record in this termination case is a rarity; it documents a success story. In March 2013, when G.H. was approximately one month old, she was removed from Mother's care after Mother was arrested for a drug offense. Mother pleaded guilty and was placed on probation for five years. The Department gave Mother a service plan, and Intervenors agreed to keep G.H. while Mother worked her service plan to regain conservatorship and possession of G.H.

Mother completed each and every task on her service plan. In September 2013, she successfully completed a ninety-day inpatient rehab program at the VOA Light Program; she completed parenting classes, cognitive classes, life skills classes, stress reduction classes, and codependency classes. As part of her probation, Mother attended aftercare treatment, one-on-one counseling, and group counselling; she also provided urine samples twice a week whenever the probation office called and requested a sample. Mother chose to enter the Salvation Army's S.T.A.R.T. program to prove to her family that she was serious about maintaining her sobriety and because G.H. could live with her there. As part of the S.T.A.R.T. program, Mother was required to look for a job, to submit to random urinalyses, and to submit to random Breathalyzer tests. Mother obtained a job selling shoes in a shoe store and worked forty hours a week. Mother attended Narcotics Anonymous classes twice a week.

Because Mother completed all tasks required of her in her service plan, in February 2014, the trial court ordered G.H. returned to Mother. Mother and G.H. had their own room at the Salvation Army; Mother planned to utilize the Wrap-Around program to obtain housing if G.H. remained with her. Mother properly cared for G.H. and obtained food, clothing, and any needed medical care for G.H.

In addition to completing her inpatient treatment program in September 2013, Mother attended church every Sunday to help her maintain her sobriety. Mother's mentor in the church helped Mother "keep strong"; she taught Mother how to be responsible and paid for Mother to get her teeth redone because Mother had lost some teeth due to her methamphetamine use. Mother had a "relapse prevention plan" in place that included calling her mentor or her pastor and his wife and "surrounding herself with them."

Mother's two probation officers testified that Mother had worked hard on the conditions of her probation and had done everything that had been asked of her. Both probation officers testified that they believed Mother would maintain her sobriety and clean, healthy lifestyle because Mother had given them no reason to believe otherwise. Likewise, Mother's counselor at the probation department testified that she worked with Mother from October to December 2013 and that Mother was motivated to maintain her sobriety and had done everything she needed to do to meet her conditions of probation, including submitting urine samples, all of which tested negative for all drugs.

4

Every single witness who possessed personal knowledge of and experience with Mother and G.H. since Mother successfully completed inpatient rehab in September 2013 testified that Mother had exhibited appropriate behavior and proper parenting techniques and that it was not in G.H.'s best interest for Mother's parental rights to G.H. to be terminated. Denise Hamilton was G.H.'s caseworker for fifteen months from March 2013 through trial in June 2014. Based on her personal knowledge of and experience with Mother and G.H., Hamilton testified that it was not in G.H.'s best interest for Mother's parental rights to G.H. to be terminated. Terica Brager was Hamilton's supervisor on G.H.'s case. Based on her personal knowledge of and experience with Mother and G.H., Brager testified that it was not in G.H.'s best interest for Mother's parental rights to G.H. to be terminated. Tabitha Githengu is a case aide at the Salvation Army. Based on her personal knowledge of and experience with Mother and G.H., Githengu testified that she did not think Mother's parental rights to G.H. should be terminated. Ms. Lori, Mother's mentor from church, had created a 501(c)(3) nonprofit organization to work with women who had gone through rehab; she had been doing ministry with the VOA Light Program for about a year and had worked with women in addiction for about four or five years prior to that. Based on her personal knowledge of and experience with Mother and G.H., Ms. Lori testified that it was not in G.H.'s best interest for Mother's parental rights to G.H. to be terminated. The factual underpinnings for each of these witnesses' conclusions that it was not in G.H.'s best interest for Mother's

5

parental rights to G.H. to be terminated are set forth in detail in the prior opinion issued in this case. *See G.H.*, 2015 WL 602585, at *9–17.

Only Mother's family members testified against her; they obviously sided with Aunt Intervenor in this termination case, which was more in the nature of a private family custody battle in light of the Department's request that Mother's parental rights to G.H. not be terminated. Mother's family members offered extensive testimony in front of the jury about Mother's horrific past, especially her past drug use and prior total lack of parenting skills.[4] Mother's adult son Dustin had been in jail for nine months prior to the termination trial and had seen Mother only once during that time when Mother and G.H. visited him in jail and put money in his inmate account. He said he had concerns about G.H. living with Mother but would have no concerns about G.H. living with Intervenors. Mother's adult son Justin testified that he had cut all ties to Mother and had not seen her since his release from prison in August 2013. He said he did not believe that Mother could parent G.H. and that it would be in G.H.'s best interest to terminate Mother's parental rights to G.H.; he opined that G.H. would be a lot better off with Aunt Intervenor because G.H. could attend good schools and have a good

---

[4]Several of Mother's family members also testified that they did not believe Mother would maintain her sobriety and speculated that she would not. But, because the maximum length of time a termination case can be open is one year and 180 days, a parent who becomes sober after a child is removed will never be able to demonstrate a lengthy period of sobriety. *See* Tex. Fam. Code Ann. § 263.401(b) (West 2014). As stated in closing by Mother's trial counsel, "In a year's time[,] you can only do a year."

6

family. Mother's son Trey offered similar testimony; he believed G.H. should live with Aunt Intervenor because she was the mother he always wished he had.[5] Uncle Intervenor expressed several concerns about Mother and her parenting of G.H. during the monitored return of G.H., but he admitted that he was not concerned enough to report them to CPS. Mother's sister Rhonda testified that despite all of Mother's progress, she did not believe G.H. should be placed with Mother because of what had occurred in the past. Rhonda's husband Roger testified that G.H. should be placed with Intervenors because he did not believe Mother could raise a child. Mother's daughter-in-law offered no termination or best-interest testimony, but she testified that Mother had yelled at G.H. and that Mother had taken out-of-town trips to visit with her former drug friends since G.H.'s return. But this testimony was directly contradicted by Mother's case manager at the Salvation Army who testified that Mother had not asked for any weekend passes since G.H. had been returned to her. And witnesses who observed Mother with G.H. on a more routine basis uniformly testified that they had never seen or heard Mother yell at G.H.

---

[5]The totality of Trey's testimony demonstrates his enormous animosity toward Mother based on her past conduct toward him. His vitriolically-phrased testimony—that one time Mother fed G.H. only a tomato before Mother's daughter-in-law fed G.H. soup, that one time Mother just stuck a bottle in G.H.'s mouth, and that one time G.H. had a diaper rash—does not rise to the level of best-interest evidence, especially in light of Trey's testimony that during the ten-month time period between Mother's September 2013 completion of inpatient treatment and the June 25, 2014 termination trial, he had seen Mother only a handful of times.

7

Giving due deference to the factfinder's weight and credibility determinations, in light of the entire record,[6] a factfinder could not reasonably form a firm conviction or belief that the termination of Mother's parental rights to G.H. was in G.H.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(2) (requiring best-interest finding for termination). In light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding that termination was in G.H.'s best interest (the testimony of all objective witnesses—four of them, all experienced in evaluating whether termination is in a child's best interest—that based on their personal knowledge of Mother and G.H., termination of Mother's parental rights to G.H. was not in G.H.'s best interest) is so significant that a reasonable factfinder could not have resolved this disputed evidence in favor of its finding. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) (setting forth standard of review); *see also In re S.R.L.*, 243 S.W.3d 232, 236 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding evidence factually insufficient to support best-interest finding when incarcerated father with violent and unstable past presented substantial and uncontradicted evidence that he had turned his life around); *In re W.C.*, 98 S.W.3d 753, 766 (Tex. App.—Fort Worth 2003, no pet.) (holding evidence

---

[6]I realize that the above evidence is recited in summary fashion. An exacting review of the entire record to determine whether the evidence is factually sufficient to support the jury's finding that termination of Mother's parental rights to G.H. was in G.H.'s best interest has already been performed, and the evidence was found factually insufficient. *See G.H.*, 2015 WL 602585, at *38–43. I summarize the evidence here for brevity.

8

factually insufficient to support best-interest finding where mother, despite past bad conduct, had "made significant progress, improvements, and changes in her life"; had a good support system in place; and had done everything possible to have her children returned); *In re C.T.E.*, 95 S.W.3d 462, 467–69 (Tex. App.— Houston [1st Dist.] 2002, pet. denied) (holding evidence factually insufficient to support best-interest finding when incarcerated father had prepared to be reunited with his family by taking parenting courses, anger management classes, and job training); *see also In re K.C.M.*, 4 S.W.3d 392, 399 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (holding evidence factually insufficient to support best-interest finding under even lesser great-weight-and-preponderance standard when mother turned her life around while incarcerated), *disapproved of by In re C.H.,* 89 S.W.3d 17 (Tex. 2002) (disapproving *K.C.M.* for not applying higher clear-and-convincing standard).

## III. CONCLUSION

For these reasons, and based on the review of the record set forth in this court's prior opinion in *G.H.*, 2015 WL 602585, at *38–43 (which the en banc majority is reversing), I would hold that the evidence is factually insufficient to support the finding that termination of Mother's parental rights to G.H. is in G.H.'s best interest.  Because the en banc majority does not so hold, I respectfully dissent.

/s/ Sue Walker
SUE WALKER
JUSTICE

DELIVERED:  June 18, 2015

10

**EXHIBIT A**

2015 WL 602585
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

MEMORANDUM OPINION
Court of Appeals of Texas,
Fort Worth.

In the Interest of G.H., A Child

NO. 02–14–00261–CV | DELIVERED: February 12,
2015

FROM THE 323RD DISTRICT COURT OF TARRANT
COUNTY, TRIAL COURT NO. 323–98128J–13. LUCY
JEAN H. BOYD, Judge.

**Attorneys and Law Firms**

Mike Berger, Fort Worth, TX, for Appellant, Mother.

Felipe Calzada, Fort Worth, TX, for Appellant, Father.

Sharen Wilson, Criminal District Attorney, Debra
Windsor, Chief of Post Conviction, Asst. Crim. Dist.
Atty., Fort Worth, TX, for Appellee.

PANEL: DAUPHINOT, WALKER, and MEIER, JJ.

### MEMORANDUM OPINION[1]

SUE WALKER, JUSTICE

### I. INTRODUCTION

**\*1** This is an ultra-accelerated appeal[2] from an order
terminating the parental rights of Appellant H.H. (Father)
and Appellant L.S. (Mother) to their daughter G.H. In one
issue, Father argues that the evidence is legally and
factually insufficient to support the trial court's best-
interest finding under Texas Family Code section
161.001(2). *See* Tex. Fam.Code Ann. § 161.001(2) (West
2014). In four issues, Mother argues that the trial court
improperly denied her motion to strike the Intervenors'
petition in intervention; that the evidence is legally and
factually insufficient to support the trial court's findings
under Texas Family Code sections 161.001(1)(D), (E),

(F), and (M) and 161.001(2); and that her trial counsel
provided ineffective assistance of counsel. *See id.* §
161.001(1)(D)–(F), (M), (2). We will affirm the trial
court's order terminating Father's parental rights to G.H.
Because we hold that the evidence is factually insufficient
to support the best-interest finding as to Mother, we will
reverse the portion of the trial court's order terminating
Mother's parental rights to G.H. and will remand the case
to the trial court for a new trial.

### II. FACTUAL AND PROCEDURAL
### BACKGROUND

#### A. Overview

The record reveals that the Department of Family and
Protective Services (the Department) initiated the
underlying suit due to Father's and Mother's
methamphetamine use. Throughout the pendency of the
case, Father was incarcerated or was undergoing inpatient
drug rehabilitation and had little contact with G.H.
Mother, on the other hand, utilized the services provided
by the Department and appeared to have turned her life
around, and the trial court granted the Department's
motion for a monitored return of G.H. to Mother.

Following the trial court's return of G.H. to Mother, the
former temporary possessory conservators—Mother's
sister and husband (the Intervenors) who had cared for
G.H. while Mother utilized her Department-provided
services—filed a petition in intervention, seeking to
terminate Mother's and Father's parental rights to G.H.
Mother responded by filing a motion to strike the
Intervenors' plea in intervention, which the trial court
denied.

During the monitored return of G.H., Mother did very
well with G.H., and the Department had "no concerns
about [G.H.]" The Department waived its termination
grounds as to both Mother and Father, deciding instead to
proceed only on its motion to modify conservatorship.

During the termination trial, numerous non-family
witnesses who were familiar with Mother's past testified
about Mother's sobriety and the changes that she had
made in her life, while Mother's adult children and other
family members testified against her, emphasizing her
past and expressing skepticism concerning the changes
that she had made. At the conclusion of the trial, the
Department asked the jury not to terminate Mother's

parental rights, to appoint the Department as permanent managing conservator of G.H., and to appoint Mother as possessory conservator of G.H.[3] The Department made no recommendation as to terminating Father's parental rights.

**\*2** After hearing the above testimony and reviewing the exhibits that were admitted into evidence, the jury found by clear and convincing evidence that Father and Mother had each committed at least one act under section 161.001(1) and that termination of the parent-child relationship between Father and G.H. and between Mother and G.H. was in G.H.'s best interest. Based on the statutory grounds found by the jury, the trial court ordered the parent-child relationship terminated between Father and G.H. and between Mother and G.H.

Because both Father and Mother challenge the best-interest finding and because we are reversing the trial court's judgment as to Mother, we set forth below a detailed summary of the record.

### B. Trial Testimony Pertinent to Mother

#### 1. Mother's Life Before Rehab

##### a. Children

Mother is the mother of Justin, Dustin, Trey, C.C., J.S., and G.H.[4] At the time of the termination trial, Justin was twenty-five years old, was working in the construction business with his father, was living with Mother's sister Aunt Rhonda, had used methamphetamine and other hard drugs, and had been in trouble with the criminal justice system. Dustin was twenty-three years old and was incarcerated in the Tarrant County Jail for possession of methamphetamine; Sara is the mother of Dustin's two children. Trey was nineteen years old and had just started working at Starbucks at the time of the termination trial; Trey had more than ten jobs the previous year and was not involved with drugs but had been in trouble with the criminal justice system as a juvenile. Mother testified that her son J.S. was nine years old, that he went to live with her sister Aunt Intervenor in 2007, and that there was a pending case regarding outstanding child support Mother owed the Intervenors for J.S. Mother testified that her son C.C. was seven years old, that her parental rights to him had been terminated in 2010, and that he had been adopted by Aunt Rhonda.

#### b. Addiction, Abusive Relationships, and Convictions

Mother admitted that she was a recovering methamphetamine addict and that she had gotten involved with drugs due to abusive relationships. Mother testified that she had started using drugs after Trey was molested by his grandfather at the age of three. Mother said that she did not know how to deal with that because she could not change the facts and could not help her son.

Mother testified that Justin and Dustin's father was an alcoholic and an abuser. Mother said that Justin and Dustin saw fighting and saw her receive injuries that required hospitalization. Mother testified that some of her assault convictions involved fighting with Justin and Dustin's father because she had learned to fight back. Mother divorced Justin and Dustin's father in 1994, and the court made her the permanent managing conservator of Justin and Dustin. Mother testified that Trey's father was very emotionally abusive and was not a good provider and that C.C.'s father was not a good provider and was not a good partner for her.

Mother testified that she had used methamphetamine for seven or eight years but that she had started using methamphetamine sixteen or seventeen years prior.[5] Mother explained that she counted seven or eight years' drug use based on the fact that she had not used while she was pregnant or while she was incarcerated from 2001 to 2003 and from 2007 to 2009. Mother said that she had stayed clean for "a little while" after she got out of prison in 2003 and that she had stayed clean for about a year after she was released from prison in 2009. Mother did not go through any inpatient or outpatient drug treatment while she was in prison or while she was out.[6]

**\*3** Mother testified that she had a conviction for injury to a child resulting from an incident during which she bit her son Justin when he was thirteen years old and left bruises. She explained that she wanted him to go with her but that he did not want to go with her. Mother said that Justin held her down, and when he did that, she "lost everything." She explained, "I didn't know what I did to him because [ ] his dad used to beat me all the time and hold me down. And I can't tell you that I even remember what happened after that." Mother testified that her sentence for that offense was two years in prison.

Mother did not know how many felony convictions she had. Mother admitted that she had previously committed fraud; she dug in the trash and obtained credit card numbers, which she used.

### c. Child Rearing While Addicted

Mother said that she raised Justin, Dustin, and Trey to adulthood when she was not in prison. Mother testified that she had always tried to be a good mother to them—making sure that they had a home and were fed—but that she had fallen short because of her addiction.[7]

Mother admitted that she had bought alcohol for Justin, Dustin, and Trey when they were minors. She said that she did that because she had a different "mind think" when she had an addiction. She explained, "Your mind ain't right. It's distorted. It's not truth, and it will tear you apart."

Mother testified that Justin and Dustin were twenty and nineteen, respectively, when she used methamphetamine with them. Mother said that Justin blamed her for getting him hooked on methamphetamine. Mother said that was not something she was proud of but that she thought "it was a way of protecting them in our addiction." She explained that she thought they would not go out on the streets and get things that might kill them, more so than what they were doing. Mother agreed that her methamphetamine use was not something that a good parent would have done, and she disagreed with her own thinking back then.

Mother admitted that before she knew that she was pregnant with G.H., she had used drugs, including methamphetamine. Mother testified that she was four months along when she learned that she was pregnant with G.H. and that she did not seek prenatal care after she realized that she was pregnant. Mother said that she did not continue to use methamphetamine after she realized that she was pregnant because she did not want her baby to ingest it. Other people in her house smoked methamphetamine while Mother was pregnant; Mother testified that she did not know where her head was when she thought that she was going to bring G.H. into a "dope house."

### d. Mother's Arrest

On January 31, 2013, Father, Mother, and Dustin were arrested for possession of methamphetamine. As a result of Mother's arrest for possession of methamphetamine, she pleaded guilty and was placed on probation[8] for five years. As part of her plea agreement, she agreed to testify against Dustin and Father.

### e. G.H.'s Birth and Removal

Mother testified that when G.H. was born a month early on February 24, 2013, she weighed a little over four pounds and spent about a month in the neonatal intensive care unit (NICU). Mother said that G.H. was not born with methamphetamine in her system. Mother said that she relapsed while G.H. was in the NICU because she did not know how to handle it.[9]

**\*4** In mid-March, the Department removed G.H. from Mother and Father's[10] care due to their use of methamphetamine; G.H. was placed in foster care. Mother testified that there were some domestic violence incidents and emotional abuse after CPS removed G.H.

In April 2013, Mother agreed to have G.H. placed in the Intervenors' home. Mother testified that she initially did not want G.H. to live with the Intervenors but that she ultimately decided to put her selfishness aside and to do what was best for G.H. Mother explained that her initial hesitation was based on her previous experience with Aunt Intervenor; Aunt Intervenor had been appointed permanent managing conservator of Mother's son J.S., and Mother had not seen him since he was three years old. Mother did not want that to happen with G.H. Mother wanted a chance to fix her life and to parent G.H.

### 2. Mother's Life After Rehab

### a. VOA Light Program

To get sober so that the Department would return G.H. to her, Mother went to the VOA Light Program, an inpatient rehab facility program. She attended parenting classes, cognitive classes, life skills classes, stress reduction classes, and codependency classes. Mother addressed her relationships with her family members and her substance abuse problems; learned how to set healthier boundaries for herself and to take personal responsibility for what she had done, for where she had been, and for who she was; and learned skills for how to talk to her relatives in order to rebuild her relationships with them. Mother was successfully discharged after completing the ninety-day program.

### b. Aftercare Treatment

As part of her probation, Mother was required to attend aftercare treatment. During the program, Mother attended one-on-one counseling, participated in group counseling, and learned how to deal with issues in a productive manner instead of using her old ways of thinking.

When Mother first started the aftercare treatment, she was required to call in to the probation office seven days a week and to provide urine samples twice a week whenever they called and requested that she give a sample. Mother testified that she had been assigned a new probation officer, and Mother's understanding was that they would call her to give a sample "whenever they so please[d]." Mother said that she was still required to report to the probation office once a month at the time of the trial.

### c. S.T.A.R.T. Program at the Salvation Army

After Mother completed the VOA Light Program, she chose to go into the Salvation Army's S.T.A.R.T. program[11] because she wanted to prove to her family that she was going to continue her sobriety and because it was a place where G.H. could live with her. As part of the S.T.A.R.T. program, Mother was required to look for a job, to continue giving urine specimens for random drug tests, to submit to random Breathalyzer tests, and to attend classes when she was not working.

### d. G.H. Returned to Mother

**\*5** As a result of Mother's compliance with her CPS service plan and her sobriety, the Department filed a motion for a monitored return of G.H. to Mother, and the trial court granted the motion. G.H. joined Mother at the Salvation Army's facility in February 2014.

Mother explained that as part of their daily routine, they woke up at 5:45 a.m., they got dressed, she fed G.H., she packed G.H.'s bag, they got on the bus, she took G.H. to day care, and she came back to the Salvation Army, which took about an hour. Mother then got ready for work and took the bus to work. She explained that it was not easy getting on the bus and riding back and forth but that it was providing a way "right now."[12]

### e. Parenting G.H.

Mother testified that she and G.H. had developed a bond since she had been back in Mother's care. Mother said that G.H. adored her and said, "Mommy, mommy, mommy, mommy, mommy, ... [e]verything is 'mommy.' " Mother offered and the trial court admitted pictures into evidence showing that G.H. was a happy child with her.

Mother said that G.H. is very smart, that she was walking, that she played with everything, and that she was not receiving services through Early Childhood Intervention. Mother noticed that G.H. watched her and said "that has really been an eye opener to me[ ] because I have to continue to watch what I do because she's going to be the product of [my behaviors]. And, unfortunately, I fell short with my other children that way."

Mother testified that she disciplined G.H. by telling her "no" and said that G.H. knew what "no" meant. Mother said that she does not use physical discipline on G.H.; Mother believed that she could discipline G.H. without resorting to family violence because she had completed parenting classes and had learned to take a breather—to walk away for a minute and then come back and handle the situation. Mother said that as G.H. gets older, she will discipline her by telling her that she might be making the wrong decision and that she needed to think about what she is doing. Mother said that she would be able to keep herself collected even if G.H. struck her because she was a different person and no longer had anger built up inside of her. Mother testified that she would do everything she possibly could to protect G.H. from current and future danger.

Mother said that G.H. was taking breathing treatments when she was returned to her but that she no longer had to take breathing treatments and that her allergies had stopped bothering her. Mother testified that she had taken G.H. to the doctor for pink eye and for a cold with a fever. Mother testified that she had taken G.H. to all of her doctor appointments and that she was up to date on her immunizations. Mother said that G.H. was due for a well-baby check the month following the trial. When G.H. had a dental exam, Mother lined up someone to take G.H. to the dentist.

Mother testified that she could meet G.H.'s current and future emotional and physical needs. When asked why she believed that, especially in light of her history, Mother explained,

The past is very ugly, and I've lived a lot of my life doing the wrong thing, but I've worked hard to get to where I am, to change my life and to change my ways and change who I am. But if it wasn't through the difficulties that I faced in life, I wouldn't be who I am today. So you have to go through the fire for God to be able to refine you into who he wants you to be.

### f. Stable Housing

**\*6** Mother testified that the Salvation Army had been a safe and stable place for her and G.H. to live for the four months preceding the termination trial. Mother testified that that they had their own room in the women and children's program, that there was a lot of security, and that they watched her as she was coming and going.

Mother said that if G.H. stayed in her care, she had a new housing opportunity at the Wrap–Around Program that would assist her for nine months with housing, with managing her money, and with giving her a fresh start. Mother testified that she was accepted into the Wrap–Around Program approximately one week before the termination trial and that she and G.H. would move into an apartment "almost immediately" if Mother were allowed to keep G.H. Mother understood that the Wrap–Around Program would initially pay for Mother's apartment and then would gradually phase her into paying for the apartment; she said that she had some furniture lined up to furnish an apartment. Mother testified that when the Wrap–Around Program ended on G.H.'s second birthday, the program would help her get into other programs.

### g. Maintaining Sobriety

In addition to completing the VOA Light inpatient program in September 2013, Mother had gone to church every Sunday to help her remain clean from methamphetamine. Mother testified that she had a very good church home with very good people who lifted her up, helped to keep her strong, and had taught her how to be a responsible woman. Mother said that she had a mentor at the church named Ms. Lori. Ms. Lori had helped Mother with any issues that had come up and had invited Mother and G.H. into her home. Ms. Lori had also paid for Mother to get her teeth redone because she had lost some of her teeth due to her methamphetamine use.

Mother testified that in addition to attending church and having a mentor, she also stayed sober by getting a job; she obtained a full-time job the day after G.H. was returned, and she had kept the job for a little over four months.[13] Mother worked forty hours per week on commission at a shoe store. Mother testified that she loved her job and that it was "fulfilling at the end of the day because I know I've put some shoes on a little old lady that needed those shoes and helped her, and on a daily basis, I get to walk home knowing that I've helped people."

Mother also stayed off drugs by attending Narcotics Anonymous classes twice a week. Mother initially had a sponsor but no longer had one; she believed that Ms. Lori served that purpose because she talked about everything with Ms. Lori. Mother testified that she was still attending NA twice a week and that the Salvation Army was still drug testing her randomly twice a week at the time of the termination trial.

Mother also had a relapse prevention plan, which included turning around and walking away, not associating with the people she used to be around, and not doing the things that she used to do. If Mother got the urge to use methamphetamine, she testified that she would call Ms. Lori or her pastor's wife and get surrounded by them. Mother testified that she had learned how to handle stress without going back to drugs. Mother said that she had "never even had a trigger" within the year preceding the termination trial because she had learned to hang around the right people, to do the right things, and to live her life right. Mother said that if she were to relapse, she would give G.H. to one of her sisters and would not keep her in her care. Mother said that Ms. Lori and Aunt Rhonda would protect G.H. "to the fullest."

### h. Other Programs

**\*7** In addition to assistance from the Salvation Army,[14] CPS,[15] Tarrant County probation, and the Wrap–Around Program, Mother said that one other program that she was participating in to help her parent G.H. was a study at her church that was teaching about family. Mother said that if she were allowed to keep G.H., she would not discontinue her participation in those programs even though she would no longer be under the microscope of the Department or the court. Mother explained that she would continue to participate in those programs because she wanted to keep the changes that she had made and wanted to do everything that she could to continue. When asked

what she could do to show that she was different to the people who were worried that she had been clean from methamphetamine for only a year, she explained that she was walking the walk, reading her Bible, and going to church and that it was not fake. She said, "[W]hen you're living the life and you have God in your life and [God] has changed your life and the way you are and you get clean from the inside out, it's a difference."

### i. Finances

Mother testified that she brought home approximately $400 to $500 every two weeks. Mother testified that Ms. Lori acted as her bank for the money she made at her job. Mother said that she paid her child support every two weeks[16] and that she had saved up over $1,000 to provide G.H. with what she needed. Mother said that she also financially helped her children and her grandchildren as much as she could; she had paid for shoes for her grandchildren and had put money on Dustin's books at the jail so that he would have credit to buy things in jail.

Mother said that she did not ask people for money but that if she needed help, she could call Aunt Rhonda, her mother, Ms. Lori, or the ladies from church. Mother said that if she were allowed to keep G.H., her family would not abandon them. Mother said that her classes had taught her how to reach out to get community services, and she planned to take advantage of them if she needed them.

### j. Contacts with Old Friends and Family

Mother testified that she was no longer hanging out with her old acquaintances with whom she had previously used drugs. She said that she had made a few bad choices about people that she had started to hang out with, that she had realized what they were doing, and that she had stopped spending time with them. Mother said that she was still hanging out with some of her family members, but, as far as she knew, they were clean.

Mother took G.H. to see Father after he was released from jail, and he visited them at the Salvation Army. Mother did not know until her caseworker told her that Father was not allowed to have visitation with G.H. unless it was supervised by CPS.

Mother agreed that one of her triggers was being around people who use methamphetamine and that she and Father had used methamphetamine together in the past. Mother said that it was hard for her to determine whether Father would be a trigger for her now because he was trying to get clean.

Mother was not sure whether she and Father would be together in the future; her focus was on working, continuing to do the right thing, and providing for G.H. She said that Father would have to be drug free and demonstrate that he had changed before he was allowed to be involved in G.H.'s life.

On cross-examination, Mother clarified that she no longer hung around the friends that she had previously used drugs with but that she had some contact with them. Mother admitted that she had contact with her friend Edie, a drug user, when they attended the funeral of a mutual friend. Mother testified that she went to Edie's house after the funeral and that Edie had driven her to see her daughter-in-law Sara. Mother said that she did not hang out with Edie on a regular basis.

Mother admitted that she had made a bad choice about the people in her life since the monitored return because she was friends on Facebook with Joe, whom she had later learned was an alcoholic. Mother testified that she had gone to Razzoo's with Joe and that she had taken G.H. with her. When shown a picture of a red frozen beverage in a Razzoo's glass, Mother testified that she did not order the drink and invoked her Fifth Amendment right against self-incrimination when asked whether she had been drinking while on probation. Mother said that when she learned that Joe was an alcoholic, she stopped talking to him.

**\*8** Mother testified that she had not had the urge to use methamphetamine since G.H. had been returned to her. When she was asked whether she had made any statements about getting as high as a dragon, Mother testified that she was trying to tell Sara that life can change for people and people can change. Mother explained that she had told Sara and Trey that if they wanted to get high,

I can show y'all how to get high. And it was a statement to say y'all know how I used to get high, and I don't have to be that person anymore, and I don't have to do those things anymore. And I've changed my ways and changed my life, and you can do the same.

When asked whether she should be making statements like that if she was truly on the road to recovery, Mother said that maybe she should not have said it in that manner.

### k. Mother's Plans for G.H.

Mother testified that her future plans for G.H. included raising her in a home that she deserved to be in; giving her the love, care, and support that she needed; trying to teach her the right ways to grow up; and bringing her to church every Sunday. Mother said that she hoped that G.H. would not find out about the bad things Mother had done, but if she did find out about them, Mother said that she would tell her that "those are things that are true, but momma has overc[a]me them[,] and it wasn't easy. It wasn't a[n] easy road to go down, but with God's help, he can change anybody and change their lives and change their ways."

### I. Mother Took Responsibility for her Actions

Mother said that if her family was called to testify, they would "tell the ugly truth as it was" and that she could not ask them to do anything different. Mother did not dispute that she had wronged her family, including her other children, in many ways for many years. Mother recognized that her addiction had torn her family apart and said that she was still trying to repair some of that damage at the time of the trial. Mother testified that there were no excuses, not even being under the influence, for the poor decisions she had made in her life; she took personal responsibility for the choices she had made and their consequences.

### m. Mother's Recommendation

Mother testified that she was forty-two years old at the time of the termination trial and that after she lost everything that she had loved, she had changed her heart, her ways, and her mind. Mother testified that G.H. is her everything and that she had a job and was trying to provide for her and do the right thing by her. Mother testified that she believed that she could be a better parent to G.H. than she had been to her other children.

Mother testified that it was not in G.H.'s best interest for Mother's parental rights to be terminated because G.H. knows who her mommy is. Mother added, "Despite my failures and my past, I'm going to do everything that I can to change things and keep them that way and give her a good life, if permitted." Mother testified that it was in

G.H.'s best interest for Mother to be named permanent managing conservator because she had worked really hard to get to where she was and had done things that she had never done before in her life, including obtaining employment, being stable, staying clean, and attending programs. If the jury did not terminate Mother's parental rights but did not feel comfortable at that point making her permanent managing conservator for G.H., she said that it would be in G.H.'s best interest for the Department to be named G.H.'s permanent managing conservator.

### 3. Testimony from Those Who Acknowledged that Mother Had Changed

### a. G.H.'s Conservatorship Worker

**\*9** Denise Hamilton testified that she had served as the caseworker for G.H. from late March 2013 to the time of the termination trial at the end of June 2014. Hamilton testified that she had visited G.H. three times when she was living with the Intervenors, that she had no concerns about G.H. while she was in their care, and that G.H. appeared happy with the Intervenors.

Hamilton testified that Mother's service plan required her to complete a drug assessment; provide safe and stable housing; refrain from criminal activities and drug use; and participate in counseling, random drug testing, and parenting classes. Hamilton testified that Mother had successfully completed all of her services. Hamilton said that Mother had asked what she needed to do next, that she had provided updates, and that she had been very compliant. Hamilton believed that Mother had made positive changes in her life during the year preceding the termination trial because she had improved her appearance,[17] had chosen to go to inpatient rehab to get clean, had maintained a drug-free lifestyle, had sought out positive friends and mentors, and had obtained a job and safe and stable housing.

When Hamilton returned G.H. to Mother in February 2014, Mother had all the items that she needed in order to care for G.H. G.H. appeared to be bonded with Mother and did not attempt to leave with Hamilton.

After the return, Hamilton made two unannounced visits to see Mother and G.H. at the Salvation Army. Hamilton said that when she visited Mother and G.H. in April, G.H. was attempting to walk and was holding Mother's fingers; G.H. was smiling and making sounds. Hamilton noted that G.H. appeared to be healthy and to have all her needs

met. Hamilton testified that she had seen G.H. the week before the termination trial and that G.H. was doing well; she was walking, was interacting with other children, was trying to talk a little bit, and was eating well.

Hamilton said that Mother properly cared for G.H. because she provided her with food, clothing, and shelter. When G.H. was sick in May 2014, Mother stayed home from work and took care of G.H. Hamilton testified that Mother was very concerned about G.H.'s development and had talked to the day care about different activities that she could do at home with G.H. to promote healthy development. Mother also encouraged G.H. in her walking and was very protective of G.H. When G.H. had scratches on her in June 2014, Mother reported them to Hamilton, who followed up with the day care and required them to prepare an incident report explaining that G.H. had fallen on some wood chips. Hamilton testified that Mother showed affection to G.H. with kisses and hugs and that G.H. hugged Mother back. Hamilton testified that she had not seen Mother physically discipline G.H.; Hamilton said that Mother disciplined G.H. by telling her "no." Hamilton testified that she had never seen G.H. fearful of Mother. Hamilton testified that Mother properly supervised G.H. and that Mother understood G.H.'s needs and capabilities because she knew exactly what G.H. wanted by the way that she moved or cried.

**\*10** Hamilton testified that Mother's life had improved since the monitored return in February 2014 because she had obtained full-time employment, had lined up affordable housing if she was allowed to keep G.H., had saved up money, and had established a good support system of family and friends to help her.

Hamilton testified that it was not in G.H.'s best interest for Mother's parental rights to be terminated because she had shown that she could take care of G.H. and because it would cause confusion to G.H., who was "very bonded" to Mother. Hamilton testified that she was aware of Mother's long addiction to methamphetamine, her criminal convictions, and her domestic violence issues and that her recommendation remained the same: she would not recommend terminating Mother's parental rights to G.H. Hamilton testified that it was in G.H.'s best interest for Mother to be appointed permanent managing conservator because Mother had shown that she could maintain stable housing, could feed G.H., could keep a job, and could remain drug free.

On cross-examination, Hamilton testified that it would concern her if Mother was spending any amount of time with someone she had used drugs with in the past because Mother could possibly use with that person again, that it would concern her if Mother did not answer the question on whether she had consumed alcohol within the last three months, and that it would concern her if Mother had started to hang around friends with whom she had previously used methamphetamine. She did not, however, change her recommendation.

### b. Hamilton's Supervisor

Terica Brager testified that she had served as Hamilton's supervisor on G.H.'s case. Brager testified that CPS's policy is that if parents are able to change their situation and provide safety and the basic needs of their children, then reunification is a possibility. Brager said that she tells parents that when they acknowledge why they are not doing a good job, complete the tasks that CPS asks them to do, and demonstrate what they have learned, then CPS can look at returning their children. Brager testified that the Department's goal is safety and permanency and that the hierarchy of their goals does not include keeping siblings together—that is merely a "best practice."

Brager testified that Mother had made the decision to do intensive rehab instead of outpatient rehab and that was a sign that she really wanted to get clean. Brager testified that she had not allowed Mother to have G.H. with her at the VOA Light Program but then allowed her to have G.H. with her at the Salvation Army due to the length of time that Mother had been drug free. Brager testified that CPS had advocated for the return of G.H. to Mother in February 2014 because Mother had been compliant "in everything that we've asked," she had been clean and sober, she had a safe place to bring G.H. to, and she was able to meet her needs. Brager admitted that she was cautious about asking the court in February 2014 to return G.H. to Mother because she had a long history of drug use, "[b]ut she ha[d] done what she needed to do" to eliminate the safety risk to herself and to G.H. Brager testified that it gave her further peace of mind that Mother's case aide at the Salvation Army was watching out for G.H. while she was in Mother's care.

**\*11** Brager said that she had sat through the trial and had seen the exhibit with the red frozen beverage at Razzoo's; had heard the testimony that Mother went to the races and to Razzoo's with Joe and had taken G.H.; and had heard the testimony that on a couple of occasions, Mother had been around her former meth-using mother-figure Edie. Brager testified that these things concerned her because (1) if someone had concerns that Mother was drinking, he or she did not make CPS aware so that they could address

it, and (2) Mother was around old people, places, and things so early in her sobriety. Brager testified that this information was not enough for her to change her recommendation of reunification because a relapse did not mean that CPS was going to go and pick up G.H. Brager testified,

There's a lot of different factors that we have to look at, but, more importantly, it's do we need to go back and get something that she may have missed in treatment before? Does she need to go back and do 30 more days inpatient and take the baby with her? There's a lot of different options for one. But there's definitely room to grow from the mistake and not just yank and start completely over.

Brager said that if she had been made aware of any alcohol use, she would have instructed the caseworker to make an unannounced visit every week and to test Mother for alcohol. Brager said that she would have also instructed the Salvation Army to give Mother a Breathalyzer test every time she returned.

Brager testified that she did not think it was in G.H.'s best interest for Mother's parental rights to be terminated because this was the first time Mother had really tried to get clean the right way and that it had worked so far for her. Brager believed that there were other options besides terminating Mother's parental rights to G.H. Brager's preference was for Mother to be named G.H.'s permanent managing conservator. Brager found comfort in the fact that if Mother was appointed G.H.'s permanent managing conservator, she would have housing for nine months from the Wrap–Around Program. Brager said that if Mother stayed at the Salvation Army, she would have support there. Brager testified that because Mother was on probation for five years, the probation department would call CPS if there was a concern. Brager believed that the church, the day care,[18] the family, and others would continue watching out for G.H. Brager testified that if the jury did not feel comfortable with CPS being out of Mother's and G.H.'s lives, her alternative recommendation would be for the jury to appoint the Department as G.H.'s permanent managing conservator, which would allow the Department more time to monitor the situation and put additional resources in place to make sure that G.H. continued to be safe.

On cross-examination, Brager admitted that with all of the protection currently in place—the probation department and the Salvation Army—she did not know about Mother's contact with Edie or Joe or about the trip to Razzoo's. Brager testified that she did not think that the evidence showed that Mother had been going to Razzoo's

or interacting with people from her past for "four whole months" but that instead the evidence showed that there had been "instances of things that she's done."

Brager testified that if the Intervenors knew about the red frozen beverage and about Mother's interactions with Edie and Joe and did not call CPS, that would be concerning. Brager testified that it would have been in G.H.'s best interest for the Intervenors to have called CPS. Brager testified that it was ultimately the client's responsibility to report behavior to her and clarified that she was not blaming the Interveners for not contacting her to report Mother's behaviors.

### c. Mother's Initial Probation Officer

**\*12** Laure Dulany, who served as Mother's probation officer from July 2013 to March 2014, testified that she had monitored Mother while she was in the VOA Light Program and then in aftercare. Mother was required to report to Dulany twice a month, and Dulany performed one home visit each month.

Mother's hair follicle drug test was submitted on January 15, 2014, which tested her for the previous ninety days, and it came back negative for all substances. The following month, Dulany and her supervisor decided that Mother could be moved to a regular probation caseload and would not have to report as often because she had done very well in aftercare; Mother had successfully completed all of her aftercare requirements, including attending an aftercare treatment group once a week, attending AA or NA twice a week, providing a urine sample twice a week, reporting to Dulany as she was scheduled to, and being at the Salvation Army when Dulany had scheduled home visits with her. Dulany testified that Mother had worked hard on the terms and conditions of her probation during the time that Dulany had handled her case because Mother did everything that was required of her; she finished all of her aftercare requirements with no problems, found a stable place to live, rode the bus everywhere she needed to go, and obtained a part-time job at Dollar Tree.

Based on the way that Mother had progressed, Dulany believed that Mother had a good chance at maintaining a clean, healthy lifestyle because Mother had not given Dulany any reason to fear that she would not maintain her sobriety.

#### d. Mother's Probation Officer at the Time of the Termination Trial

Rhonda Perine, Mother's probation officer at the time of the termination trial, testified that one of Mother's probation conditions required her to pay fees and fines and that Mother was making an effort to pay the delinquent supervision fees, which included $630 in probation fees; $645 in lab fees; and $1,744 in court fees. Perine testified that another condition of Mother's probation required her not to use, possess, or consume any alcoholic beverage. Perine said that if Mother was caught consuming alcohol, she would be given a violation, and the court would be contacted; it would be up to the judge whether to revoke Mother's probation and send her to prison. Perine, however, testified that Mother was in compliance with the conditions of her probation.[19]

#### e. Mother's Counselor at the VOA Light Program

Jessica Applegate testified that she was Mother's counselor beginning in July 2013 while she was at the VOA Light Program. Mother told Applegate during the initial session that she was in extreme need of treatment and that treatment was extremely important to her. Mother's treatment program was broken down into legal problems, family and social problems, substance abuse or substance use, employment, and discharge and aftercare. Applegate testified that Mother had attended all the groups, had completed her work, and had established some boundaries.

When Applegate switched jobs to work for the probation department, she worked with Mother from October 2013 to January 2014; Applegate was the facilitator for the weekly aftercare classes that Mother was required to attend. During the sessions, Mother participated and demonstrated her understanding of the concepts being taught.

**\*13** Applegate testified that it would be a problem if Mother had consumed alcohol during the last few months because her conditions of probation stated that she was not allowed to drink alcohol and because "depending on a specific person, a drink could lower you[r] inhibitions[,] and all of a sudden[,] you are on to different things, like drugs." Applegate testified that if Mother had established healthy boundaries and could control the location of where they met, it would be okay for Mother to associate with people from her past but that it was a possibility that meeting up with people from her past could trigger a relapse.

#### f. Mother's Counselor from October to December 2013

Angela Ceglar, Mother's counselor at the probation department, testified that she had worked with Mother from October to December 2013. During the counseling sessions with Mother, Ceglar identified two problems and two goals. Ceglar testified that problem number one was that Mother's substance use had interfered with her ability to achieve a healthy lifestyle; the goal with that was to develop a substance-free lifestyle. Ceglar testified that the second problem was that Mother's criminal conduct had interfered with her ability to achieve a healthy lifestyle, and so the goal was to develop a crime-free lifestyle. Ceglar testified that in addition to the two goals they were working toward, Mother was required to attend NA or AA at least twice a week and to provide her verification, to obtain a sponsor through the program, to attend group, to obtain employment, to meet with her supervision officer, to meet with an individual counselor, and to follow the conditions of her probation.

Ceglar testified that she worked with Mother individually and discussed situations that would come up in her life that were high-risk situations or would trigger her desire to use. When Ceglar discussed triggers specific to Mother, Mother identified old places where she used to use drugs and old friends with whom she used to hang around and with whom she had previously used drugs. Ceglar also discussed with Mother that a meth pipe or the smell could be a trigger. They talked through those triggers and used some of the skills that Ceglar had taught, as well as the skills that Mother had learned at the VOA Light Program, to help her identify how to get through that. Ceglar testified that Mother had already put all her old friends out of her life.

Ceglar met with Mother on December 5, 2013, and made the assessment that Mother appeared to be dealing well with reintegrating herself back into her family and was able to process the time that was needed for some people to forgive without being impatient about it. When Ceglar stopped working with Mother at the end of December 2013, Ceglar believed that Mother was motivated to maintain sobriety and a crime-free lifestyle because Mother's actions demonstrated that she was doing everything she needed to meet her conditions of probation, including submitting urine samples that came back negative for all drugs. Ceglar testified that Mother had demonstrated that she could successfully use mental self-control skills and that Mother had showed insight into

her past substance abuse behaviors by recognizing that the substance had played a part in what she had done to the people in her life, including her family and her children, and by changing her lifestyle to make sure that it would not happen again.

Ceglar believed that the skills Mother had learned at the VOA Light Program and through her therapy sessions, along with a supportive environment and continuing with NA/AA, would provide Mother with the foundation for a drug-free lifestyle going forward. Ceglar did not believe that stress would cause Mother to relapse because she had already dealt with some stressful situations while reintegrating back into life after her treatment and had not relapsed.

**\*14** On cross-examination, Ceglar testified that she would be concerned if Mother had used any alcohol or illegal drug within the three months preceding the trial and that she would be concerned if during that time, Mother had started to make contact with some of her old friends with whom she used to use methamphetamine. Ceglar testified that those are some small steps that could lead to a relapse.

### g. Mother's Case Aide at the Salvation Army

Tabitha Githengu testified that as a case aide at the Salvation Army, she enforced the Salvation Army's rules, gave drug tests, and transported residents. Githengu testified that since December 2013, Mother's urinalyses and Breathalyzer results had never posed a concern and that she had never reported Mother to those in management at the Salvation Army for drug or alcohol use. Githengu testified that Mother was very cooperative with her and that she always provided a urine sample right away.

Githengu testified that when she went to Mother's room in the evenings, Mother was feeding G.H. in her high chair. Githengu said that Mother gave G.H. all the nourishment she needed and that she had never seen G.H. looking uncared for. Githengu said that she had never seen G.H. act fearful of Mother. Githengu testified that based on what she had observed, Mother possessed an understanding of G.H.'s needs and capabilities because Mother met "all her physical needs, everything the child needs from a mother."

Githengu testified that Mother had made positive changes in her life during the half year that she had been at the Salvation Army; Mother had followed the rules, had taken

care of G.H., and had asked for help when she needed it. Githengu testified that she believed that Mother had changed and that Mother deserved a second chance. Githengu believed that Mother should be allowed to keep G.H. because Githengu had not had any problems with Mother and had seen her taking care of G.H. Githengu believed that Mother could provide "all the protection and everything the child need[s] from a mother."

On cross-examination, Githengu testified that Mother was part of the S.T.A.R.T. Program at the Salvation Army; that Mother had undergone random alcohol tests; that Mother would be breaking the rules if she drank alcohol; and that as far as she knew, Mother had not broken any rules at the Salvation Army.

### h. Case Manager at the Salvation Army

Tanya Porter–Hodges testified that she served as the case manager of the women's S.T.A.R.T. program at the Salvation Army. Porter–Hodges testified that she assists mothers by helping them set goals, create a budget, find employment, and find childcare. She also assists mothers with finding long-term childcare and housing and with budgeting money to transition successfully out of the program.

Porter–Hodges testified that Mother had been very cooperative during the nine months that Porter–Hodges had worked with her. Porter–Hodges believed that Mother had made positive changes in her life because she had met the goals that they had set and because she had done everything that she was supposed to do as far as raising G.H. while she was at the Salvation Army. Porter–Hodges testified that some of the goals Mother had met included finding employment, finding day care for G.H., and budgeting and saving money to pay for her probation fees.

Porter–Hodges had never seen G.H. unattended; Mother had abided by the Salvation Army's rule that children have to be with their mothers at all times. Porter–Hodges had witnessed Mother caring for G.H., feeding her, reading to her, playing games with her, and putting together puzzles with her. Porter–Hodges testified that Mother had provided G.H. with adequate health and nutritional care.[20] Porter–Hodges saw Mother nurturing G.H. when she had a fever; Mother picked her up and rocked her and abided by the rule to not have medication in the room. Porter–Hodges testified that she had never seen G.H. fearful of Mother. Porter–Hodges had not seen Mother attempt to physically discipline G.H.; she said that mothers know coming into the program that no physical

discipline is allowed. Porter–Hodges testified that Mother had no violations during the nine months that she had been at the Salvation Army.

**\*15** Porter–Hodges testified that the Salvation Army is a safe and stable living environment for Mother and G.H. because there is twenty-four-hour security. Porter–Hodges testified that there are programs available to help Mother parent and provide for G.H., including the Wrap–Around Program,[21] which would provide ongoing case management for nine months. Porter–Hodges testified that Mother had been accepted into the program but that it was on hold because Mother did not have custody of G.H.

On cross-examination, Porter–Hodges testified that the only time she knew of when Mother had asked for weekend leave was prior to G.H. being returned to her. Porter–Hodges was not aware of any time when Mother had asked for permission to go to the races with Joe, nor was Porter–Hodges aware of Mother having any visitors other than her mentor, Ms. Lori.

### i. Mother's Mentor

Ms. Lori, who had created a 501(c)(3) nonprofit organization to work with women who had gone through rehab, said that she had been doing ministry with the VOA Light Program for approximately a year and a half and that she had worked with women in addiction intermittently for four or five years prior to that.[22] Ms. Lori explained that her church has a ministry where they bring the ladies in the VOA Light Program to church every Sunday and every Wednesday night and invest God's Word in them during the ninety days that they are in the program. If the ladies chose to go to another program for further help, like the Salvation Army, Ms. Lori and other ladies from the church walked alongside them.

Ms. Lori testified that she knew Mother from her church's ministry, that she was Mother's mentor, and that they had spent time together two to three times per week for the past year. Ms. Lori testified that she was aware of Mother's past—that Mother had been a long-time methamphetamine user; that Mother had stopped using methamphetamine a year before the trial; that Mother was on felony probation for methamphetamine possession; that Mother had been convicted for causing bodily injury to a child and for assault bodily injury to a family member; that up until a year prior to the trial, Mother had been both a perpetrator and a victim of domestic violence with several men for many years; and that Mother had her

parental rights terminated to another child based on endangerment grounds.

Ms. Lori believed that Mother had made positive changes in her life in the year preceding the trial because she had watched the transformation every single day for the last year; Ms. Lori had spent time running errands with Mother, Mother had eaten with Ms. Lori's family on Sundays after church, and they had spent time together in prayer. Ms. Lori said that she had worked with other women from her church who had gone through drug rehab and that she had come to know what was genuine based on their willingness to start totally over. Ms. Lori testified that Mother had been "in absolute compliance with everything that I have been led to work with her on, teach her, whether it's emotionally, spiritually." Ms. Lori testified that Mother was an exceptional case based on her level of involvement with the church and that it had definitely helped her success rate.

Ms. Lori testified that Mother loves G.H., plays with her, adores her, and cherishes her and that they interact very well together. Ms. Lori believed that Mother understood G.H.'s needs and capabilities because she nurtured and cared for her. Ms. Lori testified that when G.H. was with Mother in Ms. Lori's home, Mother never left G.H.'s side. Ms. Lori said that she had seen Mother be patient with G.H. Ms. Lori testified that Mother had disciplined G.H. with words in a stern voice to get her attention if something was going to harm her. Ms. Lori had not seen G.H. fearful of Mother.

**\*16** Ms. Lori testified that the "dailyness" of being a mom can become very challenging but that Mother "has not broken step. She just keeps continually striving to do everything that she needs to do to be a really good mom, and she's doing a great job." Ms. Lori said that Mother was always willing to take any parenting advice or tips that Ms. Lori offered.

Ms. Lori testified that Mother provided G.H. with safe and stable housing at the Salvation Army because the rules there protect the women and the children. Ms. Lori testified that she believed Mother could meet the physical and emotional needs of G.H. now and in the future because she had seen Mother do it time and time again.

Ms. Lori testified that Mother had an adequate support system made up of "a growing realm of friends and people" from church who were willing to meet her physical, emotional, or spiritual needs.

Ms. Lori testified regarding other programs that Mother could participate in that would help her parent and

provide for G.H. Ms. Lori said that Mother had completed training at Cornerstone[23] that helped people find and interview for jobs and build a resume; immediately upon completion, Mother obtained a very good job selling shoes. Ms. Lori said that at the time of the termination trial, Mother was going through a twelve-week study on parenting at their church.

Ms. Lori testified that it was not in G.H.'s best interest for Mother's parental rights to be terminated because Mother had done "everything that she's been asked to do to be [G.H.'s] mother." Ms. Lori believed that Mother should be appointed G.H.'s permanent managing conservator because "a person can change from the inside out. And she has." Ms. Lori testified that she would continue her relationship with Mother and G.H. after the case and that she would protect G.H. "[a]t all costs." Ms. Lori said that if G.H. was at risk, she and her husband would be the first to intervene for the protection of G.H.

On cross-examination, Ms. Lori testified that Mother was not perfect and was going to continue to make mistakes, such as in parenting, but that Mother would not make mistakes that put G.H. at risk because that part of Mother's life was over. Mother had changed her attitudes, her thought processes, and her default reactions.

Ms. Lori testified that Mother knew that being around people with whom she had previously used drugs was not going to help her succeed. Ms. Lori knew that Mother had described Edie as "like a mother" and that Mother had previously used methamphetamine with Edie. Ms. Lori knew that Mother had seen Edie a couple of times at funerals when their mutual friends died but testified that, as far as she knew, Mother had not had any social or continued contact with Edie. Ms. Lori said that Mother had seen Joe once when they went to the races, but Ms. Lori did not know if they had eaten at Razzoo's.

Ms. Lori testified that it would not be in Mother's best interest to consume alcohol; it was prohibited by her probation and was against her succeeding because alcohol is a drug. Ms. Lori testified that Mother had not admitted to her that she had possibly consumed an alcoholic drink within the three months prior to the termination trial. Ms. Lori testified that if she were at a restaurant and saw Mother drinking alcohol with G.H. present, Ms. Lori would confront Mother, call her probation officer if she had consumed alcohol, and call CPS if G.H. were at risk. Ms. Lori said that Mother's parental rights should not be terminated if she had taken several sips of an alcoholic beverage because that would not keep her from taking care of her child.

**\*17** Ms. Lori testified that Mother had five rehearsals with her previous children but that was during her addiction, "[w]hich is totally different." Ms. Lori agreed that in order for it to be different, Mother has to remain drug free.

#### j. Mother's Boss

Rick Baggett, the owner of the shoe store where Mother worked, testified that she had been working with him as a salesperson for approximately three months. Baggett testified that Mother made $400 to $500 per week and that her pay varied because her job was based on commissions. Baggett testified that Mother does a "really good job." Baggett had never seen Mother get upset or frustrated at customers. He had not received any complaints about Mother from any of his employees, and he had not encountered any problems with Mother. Baggett testified that Mother arrived at work on time and that he did not have any concerns that Mother might be using any type of substances while she had been working for him.

Baggett, who was involved with an organization that ministered to the families of inmates and helped guide the inmates back into society upon their release from incarceration, testified that he was aware of Mother's legal issues and drug problems and that she seemed to be doing well as compared to other people he had worked with in his ministry. Baggett considered Mother an asset to the store and testified that he expected Mother's employment to continue but that if she left and applied again, he would hire her.

#### k. Father

Father testified that he had known Mother for eleven years and that she was no longer the same person; he said that she is now a leader and that she inspires him. Father said that Mother is a loving, wonderful person who loves G.H. and all of her children, despite what she has been through with them.

#### 4. Testimony from Son Who Recognized Mother's Change But Was Torn Over the Issue of Terminating Mother's Parental Rights

Dustin testified that he had lived with Mother until he was ten years old, and then he went to live with his father because he and Mother never really got along. He explained that he was stubborn as a child and did what he wanted, so he could not blame it all on Mother. Dustin said that whenever he fought with his father, he would run to wherever Mother was staying. Dustin said that Mother always tried to make sure that he had a place to stay if he needed one. Dustin said that he had also lived with Mother off and on at his grandmother's house after Mother was released from prison.

Dustin did not feel that Mother was in the greatest hands with the men she had dated because her ex-boyfriend Rowdy was "real mean to her." Dustin saw Rowdy beat Mother on three or four occasions—hitting Mother on the face, fighting with her, and throwing objects at her. This occurred while Mother was pregnant with G.H. Mother talked about leaving Rowdy but did not leave him after the first time that she talked to Dustin about it. Dustin eventually helped Mother move out of the house. Dustin had also seen Mother and Father argue, fight, and throw objects at each other.

Dustin first used marijuana with a friend when he was thirteen or fourteen years old. When he was fifteen or sixteen years old, Dustin started using cocaine with friends but used for only a couple of months. At age sixteen, Dustin used methamphetamine for the first time when Mother gave it to him. After Dustin used methamphetamine with Mother, he did not use it again until a couple of months later when he used it with friends and then started using it on a regular basis. Dustin quit using for a couple of months and then started using again with Mother and used "pretty much continual[ly]," though not always with Mother.

**\*18** Dustin testified that he saw Mother use methamphetamine when she was six or seven months' pregnant with G.H. Dustin said that he told Mother that she should not be using methamphetamine while she was pregnant; he said that she did not respond but did what she wanted. Dustin thought that Mother had probably used methamphetamine during the holidays in 2012 while she was pregnant with G.H. but that she was not using right before they—Dustin, Mother, and Father—were arrested on January 31, 2013.

Dustin testified that Mother received five years' probation for her possession charge and that Mother told him when she came back from court that she had to testify against him if he went to trial on his charge. He pleaded guilty to possession of methamphetamine.

Dustin testified that he had been incarcerated on the possession charge for eleven months at the time of the termination trial, that Mother and G.H. had come to see him, and that Mother had put money in his jail account. He said that Mother and G.H. came with Sara, who is the mother of his children and with whom he had previously seen Mother use methamphetamine. Mother had visited him twice a month for eight months, and Dustin had observed changes in Mother; she seemed to be doing better with her life because she had a job and was not using drugs. He said that due to his incarceration, he could not see her daily behavior, but he believed that Mother was being monitored enough "to where she can't mess up."

When asked for his opinion on whom G.H. should live with, Dustin responded, "I mean, a kid should always be with [her] parents, but, then again, I don't want to see [G.H.] end up in the same position that I ended up in. So I don't exactly know what to say to that." Dustin testified that he thought everyone deserved a chance to care for their children but that he would be very leery about giving Mother a chance to parent G.H. Dustin said that he had never really seen Mother clean while he was growing up,[24] so he was not sure if she could parent G.H. Dustin testified that the Intervenors could provide G.H. with a stable and safe environment and that he had no concerns if G.H. were to live with them.

### 5. Testimony from Those Who Expressed Skepticism Concerning Mother's Changes

#### a. Justin

Mother's son Justin testified that he had lived with Mother until he was eleven years old, that he had moved in with his father when Mother went to prison,[25] that later he had moved back in with Mother, and that he had ultimately moved back in with his father and stayed there until he was fifteen or sixteen. Justin said that he had also lived with Mother's parents at one time and that he had been living with Aunt Rhonda for eleven months at the time of the termination trial.

Justin testified about his home life with Mother and said that a lot of Mother's boyfriends were abusive. Justin had never known Mother to have a job outside the home; he said that she used to babysit children and probably sold dope. When asked whether Mother had tried, in her own way, to be a parent, Justin said that she "sort of" tried but that she did not show anyone attention because her mind

was "just out there with the drugs."

**\*19** Justin testified that in 2000, when he was eleven or twelve years old, Mother bit him during an argument. He explained that Mother became physical first by trying to hit him with her hand. Justin said that in response, he had grabbed her hands and had pinned her against the wall, that Mother had gotten free and had hit him once, that he had grabbed her, that they had gone to the ground, that she had tried to hit him again, that he had grabbed her hands, and that she had bitten his cheek. The bite broke the skin and caused bruising, but Justin did not go to the hospital. Mother was arrested for the incident.

Justin testified that Mother used to "smack us" in the back of the head and that it knocked him down once or twice. Justin said that there was a piece of trim with duct tape around it that had his name and his brothers' names written on it; Mother used that as a paddle to spank them on the bottom and sometimes the legs if they moved while she was spanking them. Justin felt that Mother was excessive in spanking him.

When Justin was seventeen or eighteen years old, Mother threw a glass candleholder at him during an argument; it hit him in the back of the head as he was leaving. The injury did not require stitches.

Justin started using marijuana at age seventeen and started drinking alcohol at age eighteen. Justin said that he had also used cocaine and that it had put him to sleep. Justin testified that he did "weed" and "coke" in the same room with Mother and that she had told him to leave the "coke" alone and to be safe out there on the streets with these products. Justin started using methamphetamine at age eighteen and first used with Mother, who provided the drug. Justin testified that when Mother told him that if he was going to use methamphetamine, it ought to be with her so that she could keep him safe, he understood that to mean that Mother had access to a purer form of the drug, unlike the stuff that was on the street that was mixed with "bad stuff" and would kill people. After the first use of methamphetamine with Mother, it became an almost daily occurrence for him to use methamphetamine with Mother and continued until he went to prison around age twenty-two. Justin, Dustin, and Mother first used together when Justin was age twenty and Dustin was age eighteen. Justin said that he continued to use methamphetamine with Dustin after Mother went to prison. Justin said that he had used methamphetamine with Mother's friends, that they used to hang out at Edie's house, that he had more than likely bought methamphetamine from Edie, and that he had seen Mother purchase methamphetamine from Edie at least ten times.

Justin testified that his criminal history included possession of a prohibited firearm under eighteen inches, a couple of theft charges, and burglary of a building. Justin said that the crimes he had committed were related to methamphetamine because he was stealing to pay for his drugs, and thus he blamed his criminal past on starting to use methamphetamine with Mother.

Justin said that he became sober because he was in prison for four years and had gone without using methamphetamine long enough to where he no longer felt the need for it. Since his release from prison at the end of August 2013, Justin had maintained a drug-free lifestyle and had not had any contact with Mother apart from seeing her in court and seeing her once at his grandmother's house. Mother had texted him a couple of times, but he said that he did not want anything to do with her because she was a negative influence on him. Justin believed that he had beaten his meth addiction but that Mother could not beat hers because he had used for only four years, not for fifteen years like Mother, and because he had remained clean for the four years he spent in prison. Justin also attributed his success to cutting all of his old ties, including those with Mother, and to making the decision not use drugs.

**\*20** Justin said that his purpose in testifying against Mother was that he did not want to see her ruin another child's life. Justin felt that Mother would ruin G.H.'s life because every time Mother was released from prison she had said that she was going to stop using drugs but never did. Justin believed that this time would be no different "[b]ecause you can only tell somebody something so many times[,] and they're just not going to believe you no more." Justin did not believe there was a chance of redemption for Mother.[26]

Justin said that people had told him that Mother was doing well, that she had a job, that she was attending church, and that she was completing all of her drug tests. Justin opined that Mother was being good only because she was on probation but that once that was over, she would return to her old habits. Justin said that Mother was still hanging out with the same people, so he opined that she was going to get in the same crowd and do the same things. But Justin admitted that he had no personal knowledge that Mother was continuing to hang out with all of her old friends.

Justin had never seen Mother with G.H., but he did not believe that Mother could adequately parent G.H. When asked what his specific concerns were about G.H. living with Mother, he said, "I mean, she's never going to—I

mean, the money she makes, she can't raise no kid. I mean, even with the benefits and all of that. And, you know, she's going to scream and holler, probably go back down to using drugs again. She's got a temper." Justin said that tempers run in their family and that once they get mad, they "don't even think no more. You just kind of blackout and stuff happens." Justin said that he was concerned that Mother would lose her temper with G.H. and that she might be slightly abusive. Justin explained that babies scream and cry and that Mother would probably yell because she did not have the patience for that. Justin said that Mother would probably have had a better chance of paying attention to others if she was not on drugs but that being off drugs would not help her anger problems or her ability to provide for a child.

Justin thought that it would be in G.H.'s best interest for Mother's parental rights to G.H. to be terminated. Justin thought that G.H. would be a lot better off with Aunt Intervenor because she had a stable home and because G.H. would attend good schools, have a good family, and be raised differently that he was.

### b. Trey[27]

Trey said that he wanted to testify because based on his experience and what he saw growing up, Mother was not mother enough to take care of G.H. Trey testified that he had pretty much raised himself and that he was a good kid because he had stayed away from drugs.

Trey said that he had only lived with Mother before he was one year old; his father took him away from Mother when she tested positive for methamphetamine.[28] Trey said that he had lived with his father off and on and that he had also lived with his cousins. At the time of the termination trial, nineteen-year-old Trey was living with his grandparents, who were Mother's mother and her stepfather.

**\*21** Trey said that when he was little, around ages three, four, or five, Mother slept all day due to her methamphetamine use[29] and that she beat him—slapping him wherever she could—with wire hangers and a telephone if he tried to leave the house because she wanted to make him stay in the bed. Trey said that this occurred a lot in his life—every time he was at his grandparents' house. His father eventually kept him from going to his grandparents' house because Mother was there.

Trey testified that Mother was a bad influence in his life because she had beat him and because she had offered him drugs and told him to come to her if he ever wanted to do drugs so that she could make sure that he did not get the "wrong stuff." Trey said that Mother had offered him "meth, ... weed and other pills and all kinds of other stuff." Trey said that the first time that Mother offered him marijuana was when he was about fifteen years old, but he did not take it. Trey said that Mother had bought drugs from Father and had given them to him.

Trey said that he was not like his brothers because he made sure that he stayed away from the lifestyle that Mother had lived. Conversely, Trey said that Mother had given him Xanax pills, he had tried them, and he had liked them; Xanax became his drug of choice, and he became addicted to it. Trey said that Mother gave him about three or four Xanax pills when he was a user. He said that he had straightened up and was no longer taking drugs because he had seen Mother's life and his brothers' lives and did not want that to be his life. Trey testified that Mother's drug use had a detrimental effect on him and her other children.

After Mother was released from prison, she came to live with Trey and his father for six months; Trey said that he was sixteen years old and that he took her in because no one else in the family wanted to take care of her. Trey said that he wanted Mother to stay with him because she was still his mom and because he thought that she would straighten up. When Mother moved in, she brought a box with birth certificates and social security cards and said that it was from when she used to steal people's identities; she said that she wanted to get rid of it, and Trey's father disposed of it in a dumpster.

Trey said that Mother was physically abusive to him when he was living with his father after she got out of prison. Trey said that Mother had hit, pushed, and kicked him and that she had threatened to knock his head off with a broomstick handle. On one occasion, Mother had grabbed a liquor bottle and had hit him on the ankle with it. On another occasion, when Trey attempted to leave the house to go to his grandparents' house to call CPS, Mother and Dustin held him down; when Trey broke free and made it to the door, Mother and Dustin slammed the door on Trey's leg and made him fall. Trey said that Dustin and Mother dragged him by the hair and started beating him—hitting him and kicking him.

Trey said that while Mother was living with him and his father, she sent him to juvenile detention. Trey said that he had a friend come over who was black and gay and that Mother and Trey's father had called the friend names. Trey told Mother and his father not to call his friend

names. Trey's father pushed Trey into the dresser, and Trey pushed his father back into the dresser, grabbed a screwdriver, and threw it at the wall. Mother called the police and said that Trey had intentionally tried to stab his father in the neck with a screwdriver, resulting in Trey going to juvenile detention.

**\*22** Trey testified that while Mother lived with him, she used his probation[30] against him and told his probation officer that she wanted Trey home by 8:00 p.m. She also tried to manipulate him to get him in trouble and told him that she would get him locked up. Trey said that he decided that he had endured enough of Mother's antics and moved in with his cousins so that he could finish his probation. At the end of Trey's probation, his probation officer told him that Mother had admitted that Trey did not intentionally try to stab his father in the neck with a screwdriver but that it was too late. Trey asked Mother why she had lied to the police, and she said that she did not want him to turn out like his brothers.

Trey testified that the house where Mother and Father lived was a crazy house. Trey said that he had helped to move Mother out of Father's house because he beat her. Trey said that he felt that this was no way for her live when she was pregnant because there was "nothing but meth users that were all around that house."

Trey said that after G.H. was removed from Mother, he had talked Mother into allowing the Intervenors to care for G.H. He said that he told Mother that she was not fit to be a mom because she did not have a job and did not have anything to take care of a baby but that the Intervenors did because they were already caring for J.S.

After Mother finished inpatient rehabilitation, she texted Trey occasionally, but he tried to avoid talking to her as much as possible because he did not want to be around "that lifestyle." Trey explained that he had actually spent time with Mother during the previous year because Mother was sometimes at Sara's house when he went to see his nephews, but he said that he tried to stay away from her as much as he could. On cross-examination, Trey said that he did not intentionally try to see Mother; she was at Sara's when he was there.

Trey testified that Mother had offered him drugs during the past year when she was hanging out with Sara. Trey then explained that for his eighteenth birthday on April 20, 2013, Mother had tried to give him a bottle of whiskey, not drugs. He said that Mother told him that she had tried it and did not like it, so she was giving the bottle to him.

Trey testified that during the previous year, he had seen Mother with Edie and that Mother had promised when she got out of prison that she would not go around Edie because that is where her addiction started. Trey said that Mother "still goes around [Edie] today." Trey said "it's been probably close to about a year" since he had been with Mother and Edie. Mother wanted him to get a haircut, and he went to get his haircut at Edie's next-door neighbor's house. Trey said that Mother told him that she and Edie had paid for his haircut with methamphetamine.

Trey said that he did not testify at the hearing in February 2014 because he had to work that day. If he had testified, he would have said that G.H. should not be placed with Mother because of his concerns about using drugs, getting beaten, and living in a shelter. He felt that the Intervenors had a lot more to offer G.H. than Mother and that Mother was not fit to be a mother.

Trey said that he had been around Mother and G.H. approximately ten times since G.H. was returned to Mother. Trey testified that on one occasion when he was with Mother and G.H. at Sara's house, Mother wanted to make some margaritas. Trey told Mother that he had to go to work. Trey said that he did not see Mother drink a margarita because she got mad and ended up leaving. Trey testified that he had not heard Mother talk about wanting a drink after that incident.

**\*23** Trey testified that he had seen Mother lose her patience with G.H. "all the time"[31] and said that "[s]he just goes crazy." He then explained that Mother did not want to hold G.H. much and that Mother asked Trey or Sara to hold G.H. He said that when G.H. was hungry, Mother stuck a bottle in her mouth, shut her up, threw her in bed, and shut the door. Trey testified that he was concerned that things like that would continue to happen.

Trey testified that one time when he kept G.H., he changed G.H.'s diaper and saw that she had a rash on her bottom. He told Mother, and she responded that he needed to give her a bath because she had just picked her up from day care. Trey asked if G.H. had eaten, and Mother said that G.H. had not eaten all day. Trey fed G.H., and she "ate the whole entire can." Trey said that he was concerned that the diaper had not been changed because G.H. was soaking wet when he picked her up from Mother. Trey texted the Intervenors because he did not have much experience with babies. Trey also talked to his grandparents, and his grandmother took care of G.H. because he did not have any ointment. Trey said that the following day, he took G.H. to Sara's house because Mother did not want her that day. When asked about his testimony that Mother did not want G.H. the day after

Trey kept her, he said that he did not know whether Mother was working that day. He said that he knew only that Sara had kept G.H. the next day and that other relatives had kept G.H. the day after that. Trey testified that he knew that there was a CPS case pending but that he had contacted only the Intervenors and his grandparents about his concerns regarding Mother's care of G.H.

Trey said that during the monitored return, Mother told him that if he ever wanted to get high, that they could get high like dragons. He said Mother made this statement when he, Mother, G.H., and Sara were in the car and were talking about Mother's past use and when she gave his brothers drugs.

Trey said that Mother had beaten him in the past year and that there were pictures. Trey believed that there was a CPS case involving him as the victim since June 26, 2013, because he had called CPS before, but he did not know for sure. Upon further questioning, Trey said that he had been beaten by Mother within the last year or two and that there were pictures. Trey said that there were multiple cases from a year to two years all the way up until he was sixteen years old. When asked to identify when Mother beat him and a CPS case was opened with him as the victim between June 26, 2013 and April 20, 2014,[32] Trey said it was after he graduated in June 2013. He could not remember the month and said that he had been beaten more than one time. Trey reiterated that the pictures were in the cases. When asked the name of the investigator who took the pictures, Trey said that he had his cousin take the pictures but that he did not remember her name. He said that he had a bad memory but later said that he remembered a lot from his childhood. When asked where the CPS investigator came to talk to him, he said it was at his house on Northwest 25th Street. He said that the investigator asked him about how Mother was treating him, and then she took pictures. He said that the investigator was a woman with short hair. He did not know when the investigator came to talk to him. When asked to describe what happened in June 2013, Trey said that Mother hit him at his house on Northwest 25th Street. When asked what he was doing when he got hit, Trey said. "I mean, it was just an incident. She got mad." That was all the detail that he would provide; he kept telling the prosecutor that he could look at the CPS case.[33] When asked who was present when Mother had beaten him within the past year, Trey said that Mother and Dustin were present. When confronted with his prior testimony that Sara was always present when he saw Mother, he said that Mother had beaten him when she had lived with him at his father's house.

**\*24** When asked about his testimony that Mother had offered him drugs since she had been out of rehab, Trey said that it was around the time when she moved in with him and his father after she paroled out of prison. He then added that Mother had offered him drugs at Father's house. After additional questioning about when Mother had offered him drugs during the past year, Trey said it was at Father's house;[34] he was sure that it had occurred after Mother was released from rehab. When confronted with the fact that Father had been in jail at the time that Mother got out of rehab, Trey said, "Well, she offered me drugs when she lived with [Father]. I don't know exactly when that was."

Trey said that he did not dislike Mother but that he did not agree with the things that she did. He said that Mother had said many times that she was going to stop using drugs but that every time, she had gone back to using and always had an excuse.

Trey testified that he wanted G.H. to go where she needed to go and to have a good life and not the life that he and his brothers had when they were little. He said that there were other people who could take care of G.H. "way more" than Mother. Trey testified that G.H. should be placed with Aunt Intervenor because she was the mother he wished that he had. He said that Aunt Intervenor was always there for her children and that there was nothing that her children would ever do without. Trey testified that because of what he had seen, his opinion would not change based on other witnesses' testimonies that Mother had stayed clean for the year preceding the termination trial.

#### c. Uncle Intervenor

Uncle Intervenor testified that he had been married to Aunt Intervenor for two years[35] and that he had a son from a previous marriage who lived with his ex-wife. Uncle Intervenor testified that he had dealt with family members who had struggled with addiction, including his brother who had died from methamphetamine use. Uncle Intervenor testified that he had not had any problems with drugs.

Uncle Intervenor testified that G.H. came to live with him and Aunt Intervenor in May 2013 and stayed with them approximately eight or nine months. Uncle Intervenor said that his intention was to provide a safe and secure home for G.H. and to adopt her, if needed. Uncle Intervenor said that he intervened in the underlying suit because G.H. needed a secure, stable home. Uncle

Intervenor testified that he had worked since he was sixteen years old, working two jobs during most of that time, and that he did not think that a baby should be placed in a situation with a forty-two-year-old woman who did not have a car, a house, or furniture and who needed government assistance to provide insurance, food, and a home when there was "a perfectly good home that she doesn't have to worry about being fed, she doesn't have to worry about electricity, she doesn't have to worry about running water."[36]

Uncle Intervenor had heard the testimony about how Mother had worked her services, had completed rehab, and was approaching her one-year anniversary of sobriety (which occurred the day after Uncle Intervenor testified). Uncle Intervenor was happy to hear that Mother had gone through rehab, but he testified that it did not sound like it was working. Uncle Intervenor did not believe that Mother could stay clean and still have dealings with her past friends, which he considered to be "little gateways" to alcohol and drugs. Uncle Intervenor said with other relatives and other friends of Mother's "coming out of the woodworks about her escapades since she's had the baby back," that did not show him that Mother had changed at all. Uncle Intervenor explained that the "escapades" he was referring to were Mother's hanging around Edie. Uncle Intervenor admitted that he did not tell CPS his concerns about Mother hanging around Edie, and he agreed that it would have been in G.H.'s best interest to tell CPS those concerns.

**\*25** Uncle Intervenor said that he was concerned about Mother's ability to maintain G.H.'s health care because Mother had asked Sara to take G.H. to the dentist. Uncle Intervenor believed that it was Mother's job to take G.H. to the doctor. Uncle Intervenor did not believe that single mothers had to get creative when meeting the obligations of their child and their employment; he believed that Mother should make time to be at G.H.'s appointments. Uncle Intervenor did not believe that G.H. had been to the doctor since they had taken her on February 18, 2014. Uncle Intervenor agreed that it would have been in G.H.'s best interest to tell CPS his concerns that G.H.'s medical needs were not being met.

Uncle Intervenor said that he had received the picture of the red frozen beverage approximately three months before the termination trial and that he did not tell CPS that he had concerns about Mother drinking alcohol or having G.H. around alcohol. He agreed that it would have been in G.H.'s best interest to tell CPS his concerns.

Uncle Intervenor testified that if a parent who was at or just below the poverty line was working her services and staying away from the stuff the parent used to do, then he could see returning a child to the parent, but he also believed that a lot of people work the system. Uncle Intervenor asked the jury to terminate Mother's parental rights.

### d. Aunt Intervenor

Aunt Intervenor testified that she had a nineteen-year-old son, a thirteen-year-old son, and Mother's son J.S., who was eight years old; she said that Uncle Intervenor had an eight-year-old son. Aunt Intervenor testified that she and Uncle Intervenor made approximately $90,000 per year and that they had lived in their house for two years.

Aunt Intervenor testified that when she was "a confused 16–year–old little girl," she had overdosed on aspirin and Tylenol, that she had seen a therapist but was not institutionalized, and that she was not diagnosed with anything. She said that she had never had any other issues or problems since then. Aunt Intervenor testified that she drank alcohol on occasion.

Aunt Intervenor testified that she thought Mother had used drugs with friends as a teenager. Aunt Intervenor recalled that when she was sixteen and Mother was twenty, Mother lit a joint in the backseat of Aunt Intervenor's car, and Aunt Intervenor pulled into a parking lot and told Mother, "If that's what you're going to do, you're going to have to get out of my car."

Aunt Intervenor learned of Mother's adult drug addiction when Trey's father removed him from Mother's care. Aunt Intervenor and Aunt Rhonda tried to talk to Mother but did not get anywhere. Aunt Intervenor found a bed in a rehab facility, but Mother was not interested. Aunt Intervenor said that when Mother continued to have positive drug tests and would not get help, Aunt Intervenor ceased having a relationship with Mother.

Aunt Intervenor testified that it was very emotional at times to watch Mother in her addiction: they watched Mother's children go through a lot of things, including being bounced around to live with other family members; there was self-destruction; and there was family destruction. Aunt Intervenor said that Mother had anger outbursts and that her attitude and the way she acted were "completely night and day from what we were used to." Aunt Intervenor testified that Mother was a yeller and a screamer; Aunt Intervenor was not sure whether Mother knew how to speak in a normal manner once she became upset because her anger took over and caused her not to

be able to calm down.

Aunt Intervenor had seen Mother hit her sons. Aunt Intervenor said that Mother had hit her sons whenever or wherever she felt like it. Aunt Intervenor said that Mother did not give her sons a normal spanking; she slapped them on the back of the head, popped them, or hit them with something. On one occasion at Aunt Intervenor's apartment when she told Mother that she did not agree with Mother's spanking her sons, Mother took her sons and left.

**\*26** Aunt Intervenor testified that Mother has had a number of men in and out of her life and that most of them had been abusive and had some kind of drug addiction or criminal past, which Aunt Intervenor did not feel was a good situation to take a child into.

With regard to J.S., Aunt Intervenor testified that Mother owed approximately $18,500 in back child support. At the most recent child support hearing that Aunt Intervenor and Mother attended, Mother asked to have her child support reduced. Aunt Intervenor testified that Mother yelled at her that she did not know why or what Aunt Intervenor was doing and that she was not going to get G.H. back and was not going to see her.

Aunt Intervenor testified that Mother texted her before Christmas 2013 and wanted her to allow G.H. and J.S. to go to their grandmother's house and spend the night so that Mother could have them overnight. Aunt Intervenor said that Denise Hamilton, the caseworker, had sent her an email that Mother was maintaining and doing well and that she could be present at family gatherings. Aunt Intervenor responded that she did not think it would be appropriate.

Aunt Intervenor met with Hamilton in September after a court hearing and shared her concerns about Mother's anger. Aunt Intervenor testified that the Department did not seem to be concerned about the issues she raised; they focused on the fact that Mother was doing well and was maintaining her sobriety.

Aunt Intervenor said that she told her attorney and the ad litem her concerns about Mother's failure to get G.H.'s shots[37] and about her concerns and allegations that Mother had been drinking and associating with people that she had used drugs with in the past. Aunt Intervenor agreed that she did not tell Hamilton or Brager about her concerns that Mother was hanging around Edie or Joe[38] or about being around the red frozen beverage at Razzoo's. Aunt Intervenor said that she did not contact CPS regarding these concerns because she had done so in the

past. Aunt Intervenor later testified that she had not contacted CPS since February 2014 when G.H. was removed from her care, so she had not told CPS of her concerns while G.H. was in Mother's care. Aunt Intervenor agreed that it would have been good for everyone involved in this case if she had given the Department the opportunity to address her concerns with Mother.

Aunt Intervenor had heard about how well Mother had done on her probation, but it had not changed Aunt Intervenor's mind. She said,

I think the work that she has done is wonderful. I think if she is completely and totally serious, that is a great thing. But I don't believe after her history that one year is enough. I don't believe that. I also believe that she will continue to be angry. You know, you can take the drugs out of her life, but how about the anger? How about, you know, the way she has raised her other children? How is she going to maintain? How is she going to get by all of those things?

Aunt Intervenor said that based on Mother's past history of drug use, she would need to see Mother stay clean for more than two years. Aunt Intervenor was also concerned that Mother would continue to hang out with the same people and that she would continue to take G.H. into inappropriate places and situations. Twice during the trial when asked what proof she had that G.H. was in immediate danger in Mother's care, Aunt Intervenor testified, "I don't have any proof that she is in immediate danger."

**\*27** Aunt Intervenor did not believe that Mother could parent a child and that, along with her desire to keep J.S. and G.H. together, was why she had testified. Aunt Intervenor testified that she wanted to adopt G.H. because she was concerned about her and felt like she and Uncle Intervenor could give her a steady and stable lifestyle. Aunt Intervenor asked the jury to terminate Mother's parental rights to G.H.

### e. Aunt Rhonda

Aunt Rhonda testified that she was not sure when Mother had started using drugs and that she had an "on and off" relationship with her because she did not condone her behavior but wanted to make sure that she was still alive. Aunt Rhonda testified that many times she literally got on her knees and begged and cried for hours for Mother to

get help, but Mother said that it was a waste of her time. After that, Mother shunned her and would not speak to her unless she needed help. Aunt Rhonda testified that she had heard from Mother whenever she was down and out or was on somebody's couch and would not wake up; she and Uncle Roger would pick her up and take her to the hospital. Aunt Rhonda testified that over the years, she had received lots of calls concerning Mother being in jail, needing help, and needing money and other basic necessities. Aunt Rhonda testified that it was very stressful and very emotional for their entire family and that Mother had not apologized for the pain that she had caused.

Aunt Rhonda said that she had testified at the hearing in February 2014 that she was not supportive of the Department's returning G.H. to Mother because Aunt Rhonda thought that G.H. would thrive better with the Intervenors. Aunt Rhonda testified that the things that would cause G.H. not to thrive with Mother were "[e]motional disturbance[s]" and anger, which were things that she had seen in Dustin and Justin who had been in Mother's care. Aunt Rhonda explained that she meant that G.H. would not be happy, would not have a normal childhood, would not have an education, and would not have the means to support herself.

Aunt Rhonda testified that during the monitored return, she had kept G.H. on Saturdays while Mother worked. Aunt Rhonda had not seen any signs of abuse or neglect of G.H. Aunt Rhonda said that she had some interaction with Mother when she transported her to work and then came back to pick her up and take her and G.H. home on Saturdays, as well as one hour that Mother spent at her house. When asked if she had any concerns during the times when she saw Mother with G.H., Aunt Rhonda testified that her time spent with them was very limited and that Mother talked to G.H. during the transports; Aunt Rhonda did not mention any yelling, hollering, or threatening. With regard to bonding, Aunt Rhonda testified that Mother seemed to care for G.H., and G.H. seemed to care for Mother.

Aunt Rhonda testified that Mother had called her for help during the monitored return. Aunt Rhonda said that she had purchased food for Mother five or six times when Mother said that she did not have milk or snacks for G.H. Aunt Rhonda said that it had been about a month since Mother had said that she did not have milk and that it had been two weeks since she had last asked for snacks for G.H.

Aunt Rhonda did not believe that G.H. should be placed with Mother, despite her year of sobriety, because Aunt

Rhonda was concerned about how Mother would handle stressful situations in life once her probation ended. Even knowing that Mother was going to be on probation for four more years, Aunt Rhonda still had concerns because of Mother's history. Aunt Rhonda said that Mother's environment was not one that she wanted G.H. to know. Aunt Rhonda testified that she wanted G.H. to know that she was going to have water and electricity, a home, a place to lay her head, her own room, a chance to obtain an education, and a normal life like C.C. and J.S. have, not like Dustin and Justin had. Even knowing that Mother had a place for G.H. to stay at the Salvation Army and afterwards with the Wrap–Around Program, Aunt Rhonda still had concerns for G.H. based on what had occurred in the past.

**\*28** Aunt Rhonda testified that she believed in the ability of a person to make herself better and to make herself more acceptable in society. But Aunt Rhonda was not convinced that Mother had changed her life for good and said that she would need to cross specific milestones to make her a believer, such as having her own home, having her own vehicle, maintaining the same employment for five years, and having decent people around her.

Aunt Rhonda was not convinced that Mother's cycle of addiction could be broken because it had not been broken previously. Aunt Rhonda testified that if Mother did not break the cycle, G.H. would be the one who had to pay the most. When asked if she believed that Mother had been clean for a year from methamphetamine, Aunt Rhonda admitted that she did not have any evidence that Mother had used drugs in the last year. When asked whether there was a chance that Mother would stay clean, Aunt Rhonda responded, "I wish. I truly wish."

Aunt Rhonda asked the jury to terminate Mother's parental rights to G.H. Aunt Rhonda believed that it was in G.H.'s best interest to be back with the Intervenors.

### f. Uncle Roger

Uncle Roger testified that he had been married to Aunt Rhonda for twenty-eight years. Uncle Roger testified that on two occasions, he had gone and picked up Mother when she was coming down off of drugs and had to monitor her. He said that on one occasion more than five years prior to the trial, she was "just about dead," and he took her to the hospital. He said that on the other occasion, Mother was coming down off drugs and was hallucinating. Uncle Roger testified that he and Aunt

Rhonda had talked over the years about trying to get help for Mother, but Mother denied that she had a problem.

Uncle Roger testified that he had seen Mother hit the boys a few times, especially Trey. Uncle Roger told Mother that she needed to quit hitting her sons.

Uncle Roger said that Dustin and Justin were very angry as a result of Mother's years of drug use. Uncle Roger said that the boys had gone from place to place and had not had someone to really take care of them. Uncle Roger testified that he loved Dustin and Justin as if they were his sons and said that he had tried to help them as much as possible.

Uncle Roger said that he had heard Mother "holler" at G.H. He explained that G.H. was giving Mother a little bit of trouble while getting out of the car, and Mother told G.H., "Come on, [G.H.] ... I don't need this tonight.... I'm tired, and I don't need all this tonight."

Uncle Roger testified that if G.H. continued to live with Mother, he did not think that she would have a good life because Mother had been at the Salvation Army for a while and he had not seen any effort to find another place to live. Uncle Roger understood that Mother had a job but said that they were still buying groceries for her and that he thought she should be saving her money to get out of the situation.

Uncle Roger testified that G.H. should be placed with the Intervenors because he did not believe that Mother could raise a child. Uncle Roger said that they had helped raise all of her children, except Trey, in one way or another, so he did not see how Mother was going to be able to raise G.H. Knowing that Mother had been clean for a year did not change Uncle Roger's opinion because she had been using drugs for about sixteen years. He said that he did not think that after a year's worth of trying to be clean that she was clean and would be capable of raising a child.

**\*29** When asked if it would be a good idea for the Department to continue to work with Mother, Uncle Roger reiterated that he did not think that Mother was capable of raising a child. Uncle Roger testified that it was not worth it to take a chance to see if the cycle could be broken. Uncle Roger said that he thought G.H. was in danger ever since she was returned to Mother because she was hanging around people that she should not be around. But when he was informed that he had a duty to report to CPS if he thought a child was being abused or neglected, he responded, "I didn't think she was being abused or neglected."

### g. Sara

Sara testified that she had conceived two children with Dustin. The first time that she used methamphetamine was when she was sixteen years old, and she used with Mother and Dustin; Mother gave her the methamphetamine.

When asked whether Mother had changed her life since completing rehab, Sara said that at first, she thought Mother had changed until Sara saw that Mother had continued to hang around the same people and to act the same way. Sara said that when they went to church, Mother acted differently; when they were around Mother's ex-boyfriend Rowdy, Mother had not changed.

Sara testified that Mother had taken a couple of trips out of town to see her ex-boyfriend Rowdy, including over Thanksgiving 2013 before G.H. was returned. Sara said that Mother had obtained a weekend pass from the Salvation Army and had stayed with Rowdy. Sara said that since Mother had gotten G.H. back, she had talked to Rowdy on the phone and had visited him in jail, but Sara did not think that Mother had taken G.H. with her when she went to see Rowdy in jail. Sara testified that she had used methamphetamine with Rowdy and Mother in the past.

Sara was present when G.H. was returned to Mother in February 2014 because they were planning to go out to eat. After they went to eat, they went to Resa's house. Sara knew Resa through Mother and had used methamphetamine with Resa. Resa met G.H., and they picked up some baby clothes from Resa. Sara testified that she had not seen Mother and G.H. with Resa at any other time during the four months preceding the trial.

Sara testified that she knew Edie through Mother and that she had used methamphetamine with Edie. Sara had driven Mother and G.H. to see Edie on two occasions. The first time, Sara took Mother and G.H. to Edie's house because Mother said that Edie was mad that she had not seen G.H. since she had been returned to Mother. Sara said that Mother called Edie before they arrived and told her to put the dope up because she was bringing the baby. Sara did not testify about the second occasion when she took Mother and G.H. to Edie's but said that on both occasions, Mother did not smoke methamphetamine while they were there, and Sara did not see Edie smoke methamphetamine while they were there.

Sara testified that Mother had sent her the picture of the red frozen beverage approximately two months before the trial. Sara testified that Mother had told her that the guy she was with at Razzoo's was Rowdy's best friend Joe, that she drank with him, and that he had tried to get her drunk. Sara said that was the second time that Mother had taken a weekend trip and that G.H. was with her that time. Sara said that at the end of the Razzoo's weekend, Joe dropped off Mother and G.H. at Sara's and that Mother told her that "the guy does methamphetamines." Sara testified that she sent the picture of the red frozen beverage to Aunt Intervenor because she cared about G.H. and felt that G.H. should be placed with the Intervenors. Sara testified that Mother had asked her if she knew who had called CPS about her drinking alcohol.

**\*30** Sara said that there was a point when Joe and Mother were texting back and forth, and he said that he did not want to talk to her anymore. Mother told Sara that was okay because "he does meth anyways, that he was—that's all he was—that's what he does, and that's all he was talking about when she was there, and that he is a big alcoholic." Sara said that Mother and Joe quit talking for a couple of weeks but that right before Sara's arrest on June 6, 2014, Mother had started talking to Joe again because she wanted him to buy her a car.

Sara testified that sometimes she had transported Mother twice a week but had not transported her every week. Sara said that Mother always told Sara or her friend to get G.H. out of the car seat. Sara said that while she dealt with getting G.H. in or out of the car, Mother sometimes put the stroller in the trunk. Sara said that she felt like she took care of G.H. more than Mother. When asked why she continued to hang around with Mother if she was such a pain, Sara said that she wanted to see G.H.

Sara said that she had heard Mother scream or yell at G.H. and that it concerned her because G.H. was a baby. Sara said that Mother did not lay a hand on G.H.

Sara testified that there was an incident at the jail and one time in the car when she thought that Mother had interacted with G.H. in an inappropriate manner. During the incident when they were visiting Dustin in jail, Mother got frustrated with G.H. because she wanted a toy and yelled at her. During the incident in the car, Mother said that G.H. better quit pulling her hair before she slapped her. Sara testified that these incidents concerned her because Mother had threatened to slap G.H. and because Sara was not sure what Mother did when Sara was not around.

At the time of the termination trial, Sara was incarcerated

for possession of a controlled substance. Sara said that Mother and Edie had come to visit her since she had been incarcerated.

### 6. Rebuttal

During rebuttal, the Department recalled Brager, who testified that she had sat through the whole trial and that she had heard testimony about things that had occurred during the monitored return that concerned her. Brager had heard Sara's testimony that after one court hearing, Mother had asked her who had told CPS about her drinking; Brager responded that her previous testimony and Hamilton's testimony was true: they had not been given any notification that Mother had allegedly been drinking alcohol. When asked what she thought about the people involved with this case who had concerns and who did not bring them to CPS's attention, Brager testified that if they had told her, she could have addressed them. Brager said that she could have implemented a safety plan that detailed who could be around and who could not be around when G.H. was with Mother and when G.H. was not in Mother's presence. Brager said that she could also have given Mother referrals for therapy. Brager testified that there were many options and that she would have called in Mother to have a "heart-to-heart" conference about the allegations.

Brager testified that her recommendation had changed to the alternative that she had previously given—that the Department be made permanent managing conservator and that Mother be named possessory conservator. Brager said that she was willing to stay in the case and that she was still willing to allow Mother to have possession while they put

all those other things in place, continue the support. There was a lot of testimony about the amount of time that she's been sober, and I can't say that we can work the case for five years, but, hopefully, my—our job is intervention, and that's what we try to do. We work to break these cycles.

**\*31** She's done more than some clients that—of mine that have only used maybe five years. It's about where she is right now, and as much as we can offer the opportunity in a safe manner, you know, for her to stay clean with [G.H.] in her possession, then we can do that.

When asked whether she had any problem with the Intervenors being named permanent managing conservators of G.H., Brager said she did not have a

problem with that.

### C. Trial Testimony Pertinent to Father

#### 1. Father

Father testified that he was living at the Bonham VA Rehab Center[39] and had been there since March 2014. Father said that in his current program, he was learning coping skills, was learning how to be a productive citizen in society, was attending six NA meetings per week, and was creating a relapse prevention plan. Father said that he chose to participate in the program through the VA because he had seen a big improvement in Mother, that he had realized what he needed to do, and that he was ready to make a change. Father testified that his discharge date from the "late phase" was set for July 26, 2014, and that he would then enter another VA program that would last a year. Father said that upon completion, he would get a chance to work for the VA hospital or "one of the government places."

Father, who had been clean for ninety-one days at the time of the trial, said that he had been addicted to methamphetamine for twenty-five years and had been in a rehab program previously in 1993 or 1994. Father took responsibility for the bad decisions that he had made in his life and did not make any excuses for them. Father said that being addicted to methamphetamine had ruined his life and had taken everything he had ever loved. Father said that he had inherited a house from his parents, that he had rented out rooms to people and had sold drugs to support himself, but that he had lost the house due to back taxes.

Father testified that his trigger for using methamphetamine was women; he felt that women were more receptive to his advances if he was under the influence. Father said that he would avoid that trigger by getting rid of his "stinking thinking" and focusing on other things. Father said that loneliness was also a trigger and that an easy way to get companionship was to associate with others who were using methamphetamine.

Father testified that he and Mother had previously used methamphetamine together a few times. Father testified that Mother stopped using methamphetamine when she learned that she was pregnant with G.H. Father said that he had continued to use methamphetamine while G.H. was in the hospital after she was born, that he and Mother had used together once or twice while G.H. was in the hospital, and that Mother had used methamphetamine after G.H. came home from the hospital.

Father testified that in addition to J.S. and G.H., he had two other daughters who were living and a son who was deceased. Father testified that his parental rights had not been terminated to any of his children. Father last held a job in 2002; he was a truck driver and lost his license for back child support. Father testified that he had not paid any child support for G.H. or any of his children.

**\*32** Father admitted that during a good portion of the case, he had been in state jail serving time for his 2013 possession conviction,[40] and thus he had visited with G.H. only a couple of times.[41] Father said that he wanted to be in G.H.'s life, to be a good father to G.H., and to have G.H. know him and his other daughters. Father testified that he loves G.H., that she inspires him, and that he did not want to lose her.

Father asked the jury to allow him to continue to be involved in G.H.'s life. Father agreed that he should not have unsupervised visits and that he would have to earn them by demonstrating his sobriety in the future. Father said that he was going to be able to keep focused for the rest of his life on trying to remain drug free. Father asked the jury not to terminate his parental rights to G.H. because it was in his best interest and G.H.'s best interest.

#### 2. Mother

Mother said that in the past, she had allowed Father to visit G.H. while she was present and that she would not allow Father to have unsupervised visits with G.H. because he needed to prove that he could remain sober. Mother testified that Father had made changes in his life after he saw the changes in her; she said that he had checked himself into rehab and had started working the services that CPS had wanted him to do a long time ago. Father's family had noticed the changes and had started to come back around.

#### 3. Hamilton

Hamilton testified that Father had visited G.H. twice. Hamilton said that Father did not accomplish any of the tasks on his service plan. Hamilton did not have a recommendation for the jury as to the termination of Father's parental rights but said that Father could have

supervised visits with G.H.

### 4. Brager

Brager testified that given Father's short length of sobriety, he would still be required to have supervised visits. Brager said that she wanted Father to get clean and stay clean so that he could be part of G.H.'s life and possibly one day have unsupervised visits. Brager said that she was not recommending that Father's parental rights to G.H. be terminated.

### D. Outcome

After hearing the above testimony and reviewing the exhibits that were admitted into evidence, the jury found by clear and convincing evidence that Father and Mother had each committed at least one act under section 161.001(1) and that termination of the parent-child relationship between Father and G.H. and between Mother and G.H. was in G.H.'s best interest. Based on the statutory grounds found by the jury, the trial court ordered the parent-child relationship terminated between Father and G.H. and between Mother and G.H., removed the Department as temporary managing conservator, and appointed the Intervenors as permanent managing conservators for G.H. Father and Mother thereafter perfected appeals.

### III. MOTION TO STRIKE PETITION IN INTERVENTION

In her first issue, Mother argues that the trial court abused its discretion by improperly denying her motion to strike the Intervenors' petition in intervention. Mother contends that the Interveners' pleadings were legally and factually insufficient to meet the minimum statutory requirements showing that appointment of Mother as sole managing conservator would significantly impair G.H.'s physical health or emotional development.

### A. Standard of Review and General Law on Standing

**\*33** The standard for determining whether the trial court improperly denied a motion to strike intervention is abuse of discretion. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.,* 793 S.W.2d 652, 657 (Tex.1990); *In re N.L.G.,* 238 S.W.3d 828, 829 (Tex.App.–Fort Worth 2007, no pet.).* Generally, an intervenor must have standing to maintain an original suit in order to intervene. *Spurck v. Tex. Dep't of Family & Protective Servs.,* 396 S.W.3d 205, 217 (Tex.App.–Austin 2013, no pet.).

An analysis of whether a party has standing begins with the plaintiff's live pleadings. *SeeJasek v. Tex. Dep't of Family & Protective Servs.,* 348 S.W.3d 523, 527 (Tex.App.–Austin 2011, no pet.). The plaintiff has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225–26 (Tex.2004). We must also consider evidence the parties presented below that is relevant to the jurisdictional issues, *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 555 (Tex.2000), including any evidence that a party has presented to negate the existence of facts alleged in the plaintiff's pleading. *SeeMiranda,* 133 S.W.3d at 227. If the facts relevant to jurisdiction are undisputed, the jurisdictional determination is a matter of law. *Seeid.*

When standing has been conferred by statute, the statute itself serves as the proper framework for a standing analysis. *SeeHunt v. Bass,* 664 S.W.2d 323, 324 (Tex.1984). The party seeking relief must allege and establish standing within the parameters of the language used in the statute. *In re H.G.,* 267 S.W.3d 120, 124 (Tex.App.–San Antonio 2008, pet. denied).

### B. Law Governing Standing in Suits Affecting the Parent–Child Relationship (SAPCR)

A party's standing to file an original SAPCR is governed by sections 102.003 and 102.004(a) of the family code. *See*Tex. Fam.Code Ann. § 102.003 (West 2014) (providing general standing to file original suit), § 102.004(a) (West 2014) (providing additional standing for grandparent or close relative to file original suit for managing conservatorship). Under section 102.003, entitled "General Standing to File Suit," an original suit may be filed at any time by "a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition." Tex. Fam.Code Ann. § 102.003(a)(9). An individual claiming standing under this statute need only file her petition and allege facts that meet the statutory

requirement. *Seeid.*; *Miranda,* 133 S.W.3d at 226. In such a case, pleading a proper basis for standing is sufficient to show standing, unless a party challenges standing and submits evidence showing the non-existence of a fact necessary for standing. *SeeMiranda,* 133 S.W.3d at 227. In that event, the petitioner must submit evidence raising a fact issue on the challenged elements to avoid a dismissal for lack of standing. *Seeid.* at 227–28. Section 102.004(b) of the family code provides a "relaxed standing rule" by which parties who would not have standing to file an original suit for managing conservatorship may nonetheless intervene in an ongoing suit if they are deemed by the court to have had substantial past contact with the child and show satisfactory proof to the trial court that appointment of a parent as sole managing conservator would significantly impair the child's physical health or emotional development. *See*Tex. Fam.Code Ann. § 102.004(b); *Spurck,* 396 S.W.3d at 217.

### C. Analysis

**\*34** Here, the record demonstrates that the Intervenors' live pleading at the time of the hearing on Mother's motion to strike the plea in intervention was the Intervenors' first amended petition in intervention, which pleaded that they had standing to intervene under sections 102.003(a)(9) and 102.004(b). Specifically, the Interveners alleged that they had actual care, control, and possession of the child for well over six months ending not more than ninety days preceding the filing of the intervention. The Intervenors' first amended petition in intervention thus alleged facts sufficient to affirmatively demonstrate that they had standing to intervene in the SAPCR filed by the Department. *See*Jasek, 348 S.W.3d at 531; *Jackson v. Wright,* No. 03–10–00391–CV, 2011 WL 3890403, at \*3 (Tex.App.–Austin Aug. 31, 2011, no pet.)(mem.op.). It was then incumbent on Mother to contest the Intervenors' intervention, which she did by filing a motion to strike.

Mother's motion, however, did not challenge any of the Interveners' factual allegations regarding standing under section 102.003(a)(9). Instead, Mother concedes that "[u]nder the broad guidelines of 102.003, the Interveners would have had automatic standing." And our review of the record supports the Interveners' factual allegations: the trial court appointed the Interveners as temporary possessory conservators of G.H. "with care, custody, and control of [G.H.]," as well as the right to have physical possession of G.H., on April 30, 2013; the trial court removed the Interveners as temporary possessory

conservators of G.H. on February 18, 2014—reflecting that they had physical possession of G.H. for more than six months; and the Interveners filed their petition in intervention on March 4, 2014, which was not more than ninety days after they lost actual care, control, and possession of G.H. The Interveners thus established their right to intervene as a matter of law.[42] *See*Jasek, 348 S.W.3d at 537 (holding that couple, with whom the Department had placed children after removing them from biological parents, demonstrated standing under section 102.003(a)(9) to intervene in SAPCR initially filed by the Department); *Jackson,* 2011 WL 3890403, at \*3 (holding that paternal step-grandmother established standing as a matter of law under section 102.003(a)(9) to intervene in SAPCR); *Smith v. Hawkins,* No. 01–09–00060–CV, 2010 WL 3718546, at \*4 (Tex.App.–Houston [1st Dist.] Sept. 23, 2010, pet. denied) (mem.op.) (holding that aunt established standing under section 102.003(a)(9) to intervene in SAPCR). We therefore hold that the trial court did not abuse its discretion by denying Mother's motion to strike the Intervenors' petition in intervention. *See*Smith, 2010 WL 3718546, at \*2, \*4 (holding that trial court did not abuse its discretion by denying father's motion to dismiss aunt's intervention). We overrule Mother's first issue.

### IV. Section 161.001(2) Best–Interest Finding

In his sole issue, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of Father's parental rights to G.H. is in her best interest. In her third issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of Mother's parental rights to G.H. is in her best interest.

### A. Burden of Proof and Standards of Review

**\*35** In this termination case, the Intervenors seek not just to limit parental rights but to erase them permanently—to divest the parents and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. *See*Tex. Fam.Code Ann. § 161.206(b) (West 2014); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). Consequently, because the Intervenors seek to sever permanently the relationship between a parent and a child, they must first observe fundamentally fair procedures. *See*In re E.R., 385 S.W.3d 552, 554 (Tex.2012) (citing *Santosky v. Kramer,* 455 U.S. 745,

747–48, 102 S.Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.,* 384 S.W.3d 796, 802 (Tex.2012); *E.R.,* 385 S.W.3d at 554–55; *Holick,* 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam.Code Ann. §§ 161.001, .206(a) (West 2014); *E.N.C.,* 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.,* 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.' "*E.R.,* 385 S.W.3d at 555 (quoting *Santosky,* 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex.2002); *see also E.N.C.,* 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.Code Ann. § 101.007 (West 2014); *E.N.C.,* 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam.Code Ann. § 161.001; *E.N.C.,* 384 S.W.3d at 803; *In re J.L.,* 163 S.W.3d 79, 84 (Tex.2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987); *In re C.D.E.,* 391 S.W.3d 287, 295 (Tex.App.–Fort Worth 2012, no pet.).

### 1. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex.2005).

We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we

disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.,* 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.,* 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573. If we determine that no reasonable factfinder could form a firm belief or conviction that the termination of the parent-child relationship would be in the best interest of the child, then the evidence is legally insufficient, and we must generally render judgment for the parents. *J.F.C.,* 96 S.W.3d at 266; *see* Tex.R.App. P. 43.3.

### 2. Factual Sufficiency

*36 We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.,* 437 S.W.3d 498, 500 (Tex.2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.,* 209 S.W.3d 105, 108 (Tex.2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam.Code Ann. § 161.001(2); *In re C.H.,* 89 S.W.3d 17, 28 (Tex.2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.,* 209 S.W.3d at 108.

### B. Presumption and *Holley Factors*

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.,* 209 S.W.3d 112, 116 (Tex.2006).

We review the entire record to determine the child's best interest. *In re E.C.R.,* 402 S.W.3d 239, 250 (Tex.2013). Nonexclusive factors that the trier of fact in a termination

case may also use in determining the best interest of the child include:

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the best interest of the child;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976) (citations omitted); *seeE.C.R.,* 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.,* 384 S.W.3d at 807.

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.,* 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* That is, "[a] lack of evidence does not constitute clear and convincing evidence." *E.N.C.,* 384 S.W.3d at 808.

### C. Analysis of Evidence Pertaining to Father Under the *Holley* Factors[43]

G.H. was approximately fifteen months old at the time of the termination trial, and thus her desires were not known. There was no evidence that G.H. was bonded to Father. This factor weighs neither in favor of nor against termination of Father's parental rights to G.H. *Seeid.*(stating that a lack of evidence does not constitute

clear and convincing evidence supporting termination).

Father was not in a position to meet G.H.'s physical and emotional needs because he was in the process of completing drug rehabilitation and then planned to participate in a year-long aftercare program. Because Father had been clean for only ninety-one days at the time of the termination trial, the emotional and physical dangers to G.H. now and in the future included the following possibilities: housing instability or homelessness due to Father's drug addiction, convictions, and unemployment; exposure to domestic violence because Father had physically abused Mother while she was pregnant with G.H.; and exposure to drugs if Father was unable to maintain his sobriety and began using and selling again. These factors weigh in favor of termination of Father's parental rights to G.H.

**\*37** With regard to Father's parental abilities, the record revealed that Father had not completed any of the tasks on his service plan, that he had not provided child support for any of his children, and that he had visited with G.H. only a few times. With regard to the stability of the proposed home, Father had lost his home due to his failure to pay taxes and was unable to provide a stable home for G.H. due to his ongoing drug rehabilitation. These factors weigh in favor of termination of Father's parental rights to G.H.

With regard to programs available to help Father to promote the best interest of G.H., Father had not worked any of the tasks on his service plan. This factor weighs in favor of termination of Father's parental rights to G.H.

The Intervenors' plan was to adopt G.H. Father's plans for G.H. included wanting her to know him and to know his other children and desiring for her to have a good father, but he recognized that he could not have unsupervised visits until he demonstrated that he could maintain his sobriety. This factor is neutral.

With regard to the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, the evidence demonstrated that Father had been addicted to methamphetamine for twenty-five years, had multiple convictions, had been absent from G.H.'s life while in jail and in drug rehabilitation, had not held a job since 2002, and had never provided financially for G.H. This factor weighs in favor of termination of Father's parental rights to G.H.

Father did not make excuses for his past; he accepted the role that his drug addiction had played in losing everything he had ever loved, and he was pursuing

sobriety through the VA's inpatient drug rehabilitation programs. This factor weighs against termination of Father's parental rights to G.H.

We hold that the jury was entitled to find that the majority of the *Holley* factors weighed in favor of termination of Father's parental rights to G.H.

Viewing all of the evidence in the light most favorable to the best-interest finding and considering the nonexclusive *Holley* factors, we hold that the jury could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Father and G.H. was in G.H.'s best interest, and we therefore hold the evidence legally sufficient to support the jury's best-interest finding. *See* Tex. Fam.Code Ann. § 161.001(2); *Jordan v. Dossey,* 325 S.W.3d 700, 733 (Tex.App.–Houston 2010, pet. denied) (holding evidence legally sufficient to support finding that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination). Similarly, reviewing all the evidence with appropriate deference to the factfinder, we hold that the jury could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Father and G.H. was in G.H.'s best interest, and we therefore hold that the evidence is factually sufficient to support the jury's best-interest finding. *See* Tex. Fam.Code Ann. § 161.001(2); *Jordan,* 325 S.W.3d at 733 (holding evidence factually sufficient to support finding that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination); *In re S.B.,* 207 S.W.3d 877, 887–88 (Tex.App.–Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with [a] family service plan support a finding that termination is in the best interest of the child."). We overrule Father's sole issue.

### D. Analysis of Evidence Pertaining to Mother Under the *Holley* Factors[44]

**\*38** At the outset of our analysis, we note that the Intervenors' response to Mother's third issue does not contain an analysis of each of the *Holley* factors but instead argues only that the best-interest finding is supported by the evidence of Mother's past criminal conduct and her arrest for possession of methamphetamine prior to G.H.'s birth. As demonstrated by our analysis below, when considered in the context of all of the *Holley* factors, the evidence relied on by the Intervenors is not factually sufficient to support the best-

interest finding.

The primary evidence and testimony relied upon by the Department as supporting the finding that termination of Mother's parental rights is in G.H.'s best interest includes the following: that Mother had used methamphetamine while she was pregnant with three of her children, including G.H.; that Mother had lost patience with G.H. and had yelled, hollered, or threatened to slap her;[45] that Mother could not properly parent G.H. because Mother had an anger problem; that Mother asked Sara to care for G.H. when they were together by getting G.H. out of the car seat while Mother got the stroller ready; and that according to Trey on one occasion when he picked up G.H. from Mother immediately after Mother had picked up G.H. from daycare, G.H. had not been fed, bathed, or changed. The Department fails to tie Mother's past methamphetamine use to the second and third *Holley* factors' time frame of "now and in the future"—instead focusing on Mother's past, and the Department discounts Mother's sobriety when analyzing the parenting abilities factor. The remainder of the evidence and testimony relied on by the Department as establishing by clear and convincing evidence that termination of Mother's parental rights to G.H. is in G.H.'s best interest was provided by family members who admitted that they had avoided contact with Mother, had not spent much time with her during the year preceding the termination trial, and had been horribly hurt by Mother's past drug addiction. Their testimony was contradicted by other, non-family witnesses who saw Mother routinely during the monitored return and did not observe this behavior by Mother.

We will now set forth an analysis of each of the *Holley* factors and will set forth the evidence—in addition to the above evidence—relied on by the Department under the specific factors.

### 1. Desires of the Child

G.H. was approximately fifteen months old at the time of the termination trial, and thus her desires were not known. Mother testified that G.H. called her "mommy." Hamilton testified that G.H. was very bonded to Mother and that it would cause confusion for G.H. if Mother's parental rights were terminated. Aunt Rhonda testified that Mother cared for G.H. and that G.H. cared for Mother.

The Department sets forth a similar analysis of the first *Holley* factor in its brief and argues that this factor weighs neither for nor against termination. Because evidence that a child loves a parent is marginally relevant to a best-

interest finding, we hold that the factor weighs slightly against termination of Mother's parental rights to G.H. *See In re M.H.,* 319 S.W.3d 137, 150 (Tex. App.–Waco 2010, no pet.).

### 2. Emotional and Physical Needs of G.H. Now and in the Future

**\*39** Although G.H. was born one month prematurely, she did not have any special needs. The evidence demonstrated that Mother was providing a safe place for G.H. to live at the Salvation Army and that Mother had lined up future housing for her and G.H. with the Wrap–Around Program. Mother's case aide at the Salvation Army testified that Mother gave G.H. all the nourishment she needed and that she had never seen G.H. look uncared for. Mother had sought out medical care for G.H. when she was sick and knew that she was due for a well-baby exam the month following the termination trial. Mother had also made sure that G.H. had regular dental exams. The evidence further revealed that Mother showed G.H. affection by kissing and hugging her. Mother nurtured G.H. by encouraging her as she learned to walk and by seeking out developmental activities that she could do at home with G.H. Mother's case aide testified that Mother had met all of G.H.'s physical needs and had met "everything the child needs from a mother."

The Department argues in its brief that Mother cannot meet G.H.'s needs on a long-term basis and focuses on Uncle Roger's testimony that he did not believe Mother was capable of raising a child and on Justin's testimony that he did not want to see Mother ruin another child.

The Department discounts the evidence that Mother actually was meeting G.H.'s physical and emotional needs at the time of the termination trial and that Mother had made changes in her life to continue providing for G.H. in the future. The evidence demonstrates that Mother has successfully been able to take care of G.H.'s physical and emotional needs and has plans to obtain continued financial assistance to cover the cost of housing, day care, and food to provide for G.H.'s physical and emotional needs in the future. We hold that this factor weighs against termination of Mother's parental rights to G.H.

### 3. Emotional and Physical Danger to G.H. Now and in the Future

Mother completed all of her CPS services and complied with most if not all of her probation conditions to reduce the emotional and physical danger to G.H. now and in the future. Mother testified that she was committed to maintaining her sobriety and to working and providing for G.H. Mother vowed to not allow Father unsupervised visits with G.H. unless he demonstrated his sobriety, thus mitigating the possibility that G.H. might be exposed to the danger of domestic violence.

In its brief, the Department points to evidence that Mother had not changed because after rehab, she had spent time with her old "meth friends" (Edie, Resa, Father, and Sara), had taken G.H. with her when she spent the weekend with Joe, a drug user and alcoholic, and had possibly consumed an alcoholic beverage at Razzoo's.

The evidence established that Mother did not spend significant time with her old "meth friends" or with Joe and that she did not use drugs with them the few times that she was around them. Although pictured on one occasion with a red frozen beverage in front of her at Razzoo's, Mother never failed a Breathalyzer test or a drug test, despite random testing two times a week for approximately nine months. Even Aunt Intervenor testified that she did not have any proof that G.H. was in immediate danger in Mother's care. We hold that this factor weighs against termination of Mother's parental rights to G.H.

### 4. Parental Abilities of the Individuals Seeking Custody

The record revealed that the Intervenors had been caring for Mother's son J.S. since he was eighteen months old and that they had cared for G.H. for approximately nine months before her monitored return to Mother. A question was raised about the Intervenors' parenting abilities because they admitted that they did not report the concerns they testified to at trial about Mother's care of G.H. during the monitored return to CPS.

The evidence demonstrated that Mother was providing a safe, stable home environment for G.H. at the Salvation Army and that G.H. was receiving proper nourishment and was properly cared for. Mother had completed the parenting classes required by her CPS plan and had sought out additional parenting instruction through her church. Mother no longer disciplined by spanking. Ms. Lori saw Mother several times each week and testified that Mother was patient with G.H. Hamilton and Ms. Lori testified that they had never seen Mother physically

discipline G.H. but that they had seen Mother correct G.H. by telling her "no." Porter–Hodges had observed Mother caring for G.H. while she was sick, feeding G.H., reading to her, playing games with her, and putting together puzzles with her. Githengu had observed Mother taking care of G.H. and said that Mother provided all the protection and "everything the child needs from a mother."

**\*40** In its brief, the Department, in addition to its other evidence set forth above, relies on testimony from Mother's family that they had purchased groceries for Mother. A parent's poverty alone is not a basis for termination; the fact that Mother's family had purchased groceries for her does not show that Mother cannot parent G.H. *Accord* *In re J.W.,* 152 S.W.3d 200, 207 (Tex.App.– Dallas 2004, pet. denied) (recognizing that termination should not be used to merely reallocate a child to "better" or more prosperous parents), *cert. denied*, 546 U.S. 1061 (2005). Overall, the evidence established that Mother was utilizing the parenting skills that she had learned in her classes and was able to properly parent G.H., resulting in the trial court's granting a monitored return of G.H. to Mother. We hold that this factor weighs against termination of Mother's parental rights to G.H.

### 5. Programs Available to Assist Mother to Promote the Best Interest of G.H.

Throughout the case, Mother participated in every program that she was offered. She had completed all of the services offered by CPS and was working her probation requirements, including attending NA/AA twice a week and submitting breath and urine samples upon demand. She had successfully completed inpatient drug rehabilitation at the VOA Light Program and had voluntarily chosen to do further treatment at the Salvation Army. While at the Salvation Army, she took advantage of all of the programs they suggested, including those offered at Cornerstone. Mother had lined up future housing with the Wrap–Around Program and had utilized the day care subsidies provided by CPS, which would continue for six months after the case was closed and could be extended indefinitely as long as she completed paperwork and continued working. At the time of the termination trial, Mother was attending her church's programs on parenting. At the conclusion of the trial, Brager testified that she was willing to continue working with Mother and to put additional programs and a safety plan in place to ensure that Mother would maintain her sobriety and be able to care for G.H.

The Department concedes in its brief that there was evidence that Mother had benefitted from the programs available to her but argues that there was evidence that Mother had not changed.

The testimony that Mother had not changed came from family members who had observed Mother's failed attempts at sobriety in the past. The evidence established that Mother had not used drugs during the year prior to the termination trial, indicating that Mother had not only benefitted from the programs available to her but also that she had eliminated the problem that had resulted in G.H.'s removal. We hold that this factor weighs against termination of Mother's parental rights to G.H.

### 6. Plans for G.H. by Those Seeking Custody

The Intervenors planned to adopt G.H. and to reunite her with J.S. if Mother's parental rights were terminated.

Mother testified that her future plans for G.H. included raising her in a home that she deserved to be in; giving her the love, care, and support that she needed; trying to teach her the right ways to grow up; and bringing her to church every Sunday.

The Department did not dispute these plans but nonetheless argues that they weighed in favor of termination, which fails to take into account the strong presumption that keeping a child with a parent is in the child's best interest. *See* *R.R.,* 209 S.W.3d at 116. In light of that presumption, we hold that this factor weighs against termination of Mother's parental rights to G.H.

### 7. Stability of Proposed Placement

The evidence revealed that the Intervenors had lived in their home for two years at the time of the termination trial and that they could provide a stable home for G.H.

**\*41** The evidence revealed that Mother also could provide a safe and stable home for G.H. at the Salvation Army and that she had lined up safe and stable future housing with the Wrap–Around Program.

The Department focused in its brief on Mother's probation, on her prior incarceration, and on the amount of back child support that Mother owed the Intervenors for J.S.

Although Mother was on probation, her probation officer testified that Mother was in compliance with the conditions of her probation. Any testimony that Mother would not be able to provide a stable home—due to her probation or her prior incarceration—was conjecture based on Mother's past and did not take into account the stability that she had achieved as a result of her sobriety. Moreover, Mother testified that child support was deducted from her pay check, and based on her boss's testimony that he expected her employment to continue, there was no evidence that Mother's child support obligation for J.S. would prevent her from providing a stable home for G.H. We hold that this factor weighs against termination of Mother's parental rights to G.H.

### 8. Mother's Acts or Omissions that Indicate that the Parent–Child Relationship is Not Proper

Mother did not deny that she was not a good parent while she was a drug addict; she openly testified regarding the abuse that she had inflicted on Justin, Dustin, and Trey when they were growing up; the domestic violence that they had witnessed; her use of drugs with them; her use of drugs while pregnant; and her criminal convictions. The key difference at the time of the termination trial was that Mother had utilized all of the programs available to her through CPS and through the probation department to become sober and to learn how to be a proper parent, that Mother had eliminated the root of the problem that led to G.H.'s removal, and that Mother had earned the monitored return as a result of her lifestyle changes.

In its brief, the Department focuses on the evidence set forth previously and additionally argues that Mother had exposed G.H. to domestic violence while she was pregnant with G.H. Mother vowed to not allow Father unsupervised visits with G.H. unless he demonstrated his sobriety, thus mitigating the possibility that G.H. might be exposed to the danger of domestic violence. Moreover, the other evidence that the Department points to was derived from family members who refused to acknowledge the possibility that Mother's lifestyle changes were permanent because the changes had not continued long enough to convince the family members of a lasting change. Before they would believe that Mother had changed and could parent G.H., the family members wanted Mother to demonstrate sobriety for longer than two years, to hold the same job for five years, and to own her own home and car—none of which are required under the family code.[46] When Mother's sobriety and lifestyle changes are viewed in light of the statutory timeframe, the

evidence pointed to by the Department does not constitute clear and convincing evidence that the parent-child relationship between Mother and G.H. is improper. We hold that this factor weighs against termination of Mother's parental rights to G.H.

### 9. Excuses for Mother's Acts or Omissions

**\*42** Mother admitted that there was nothing right about the things that she did when she was using methamphetamine. She admitted that it was "not the right way of thinking" when she believed that she was protecting her children by having them use drugs with her rather than using on the streets or with other people. Mother said that continuing to use drugs was nobody's fault but her own. Mother thus took responsibility for the acts and omissions that had caused G.H.'s removal, and she changed her life. Although the Department asserts that because mother offered no excuses, this factor weighs in favor of termination, we hold that Mother's refusal to offer excuses for her past behavior and her focus on maintaining sobriety in the future weighs against termination of her parental rights to G.H. *AccordIn re R.W.,* No. 01–11–00023–CV, 2011 WL 2436541, at \*10 (Tex.App.–Houston [1st Dist.] June 16, 2011, no pet.)(mem.op.) (holding that because mother offered some excuse for her failure and made some effort to improve the living situation for her children, factor weighed against termination).

### 10. Other Evidence

Because the *Holley* factors set forth above are not exhaustive, other evidence may be considered. *SeeE.C.R.,* 402 S.W.3d at 249; *C.H.,* 89 S.W.3d at 27. Here, the evidence demonstrated that Mother overcame obstacles that had plagued her for most of her life, including drug addiction, unemployment, unsafe housing, domestic violence, and utilizing improper discipline techniques. Her progress in these areas was measured by employees of CPS, the probation department, the VOA Light Program, and the Salvation Army's S.T.A.R.T. Program—all of whom are experts trained in evaluating the likelihood of the parent's continued success and the risk to a child posed by the parent. In this case, the experts determined that Mother had demonstrated a pattern of success in completing her CPS plan and in abiding by her probation conditions, that the likelihood she would continue to succeed was high, and that the risk to G.H.

upon return had been minimized. Moreover, the Department did not seek termination of Mother's parental rights to G.H. at trial and was willing to continue to work with Mother to put additional safeguards in place to ensure her future success.

### 11. Factually Insufficient Evidence to Support Best–Interest Finding

Viewing all of the evidence, no reasonable factfinder could form a firm belief or conviction that termination of Mother's parental rights to G.H. was in G.H.'s best interest. The disputed evidence on whether termination of Mother's parental rights was in G.H.'s best interest is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *SeeJ.F.C., 96 S.W.3d at 266.* The disputed evidence that a reasonable factfinder could not have credited in support of its finding that termination of Mother's parental rights to G.H. was in G.H.'s best interest included evidence that G.H. was very bonded to Mother; that since G.H. was returned to Mother, Mother had provided safe, stable housing to G.H. and had lined up future housing; that Mother had provided proper health and nutritional care to G.H.; that Mother understood G.H.'s developmental needs and had asked the day care for tasks she could do at home with G.H.; that Mother had worked all of her CPS services; that Mother had successfully completed inpatient drug rehabilitation; that Mother had successfully completed aftercare treatment; that Mother had been drug-free for a year at the time of the termination trial; that Mother had never had a positive drug or alcohol screening with the Salvation Army or the probation department; that Mother was in compliance with the conditions of her probation; that Mother had secured full-time employment and that her boss expected her employment to continue; that Mother had a support system, including a mentor who was dedicated to helping Mother succeed as a parent and who was dedicated to protecting G.H.; that Mother would continue to be monitored during the remaining four years of her five-year probation; that Mother had taken responsibility for her past conduct and was dedicated to maintaining her sobriety; that there was no evidence that Mother had ever physically disciplined G.H.; that there was no evidence of neglect or abuse seen by those who saw G.H. frequently; that during the monitored return, no one had filed an emergency motion to remove G.H.; and that according to Aunt Intervenor, G.H. was not in immediate danger in Mother's care.

**\*43** The evidence that the jury could have credited in support of its finding that termination of Mother's parental rights to G.H. was in G.H.'s best interest included evidence that Mother had a past history of drug use, criminal convictions, and child abuse; that while she was pregnant with G.H., Mother had used methamphetamine and had endured domestic violence; and that during the monitored return, Mother had been in contact with and occasionally had taken G.H. around her old friends and Father, who were drug users.

We have given due consideration to the evidence that the jury could have credited in support of its finding that termination of Mother's parental rights to G.H. was in G.H.'s best interest. Nonetheless, we conclude that the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of Mother's parental rights to G.H. was in G.H.'s best interest. Given the strong presumption that a child's best interest is served by maintaining the parent-child relationship and given the high evidentiary standard that the Intervenors must meet, we hold that the evidence is factually insufficient to defeat the strong presumption that G.H.'s best interest is served by maintaining the parent-child relationship between her and Mother. *SeeR.R., 209 S.W.3d at 116; H.R.M., 209 S.W.3d at 108; In re J.P.,* No. 02–10–00448–CV, 2012 WL 579481, at \*9 (Tex.App.–Fort Worth Feb. 23, 2012, no pet.)(mem. op. on reh'g) (holding evidence factually insufficient to support best interest); *In re N.A.,* No. 02–10–00022–CV, 2010 WL 3834640, at \*11 (Tex.App.–Fort Worth Sept. 30, 2010, no pet.)(mem.op.) (same). We therefore sustain the portion of Mother's third issue challenging the factual sufficiency of the evidence.[47]

### V. CONCLUSION

Having overruled Father's sole issue, we affirm the trial court's judgment terminating his parental rights to G.H. Having sustained the portion of Mother's third issue challenging the factual sufficiency of the evidence to support the best-interest finding, we reverse the portion of the trial court's judgment terminating Mother's parental rights to G.H. and remand the case to the trial court for a new trial.

DAUPHINOT, J., filed a concurring and dissenting opinion.

MEIER, J., concurs without opinion.

LEE ANN DAUPHINOT, JUSTICE, concurring and dissenting.

Because I believe that the evidence is factually sufficient to support the jury verdict and the trial court's termination of the parental rights of both parents, I respectfully dissent from the majority's decision to reverse the trial court's judgment and to remand for a new trial as to Mother.

Footnotes

1       See Tex.R.App. P. 47.4.

2       See Tex.R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

3       Although the Department supported Mother at trial and requested that she be named G.H.'s possessory conservator, on appeal, the Department has filed briefs supporting the trial court's judgment terminating Mother's and Father's parental rights to G.H. Mother has filed a "Motion To Strike State's Response Brief," and the Department has filed a response. We decline to strike the Department's brief and overrule the "Motion To Strike State's Response Brief," but throughout the opinion, we will set forth the various positions taken by the Department. G.H.'s guardian ad litem stated in a letter to this court that he agrees with and supports the briefs filed by the Department.

4       Pursuant to Texas Rule of Appellate Procedure 9.8(b), we refer to Mother's minor children by aliases.

5       Mother said that she had a hard time remembering things and that it might be due to her past drug use.

6       Mother admitted that she had several prior CPS cases but had never been ordered to go to drug rehabilitation.

7       While Mother was on drugs, she never tried to find a job outside the home; she babysat her sisters' children and other people's children or was supported by her husband or her boyfriend at the time.

8       Although "probation" is now referred to as "community supervision," see generally Tex.Code Crim. Proc. Ann. art. 42.12 (West Supp.2014), we use the term "probation" throughout the opinion because that is the term used in the record.

9       Mother said that she used daily until she went to inpatient rehab on June 27,2013.

10      Mother testified that she was not married to Father, that he was the father of her son J.S. and G.H., and that she had lived with Father off and on when J.S. was conceived and later before she went into inpatient rehab.

11      The S.T.A.R.T. Program is a six-month program for employable mothers who are either coming out of rehab or off the streets.

12      Mother testified that she did not have a car.

13      When Mother went to the Salvation Army, she was working ten to fifteen hours per week at the Dollar Tree, which was not enough to survive on.

14      Mother did not have to pay to live at the Salvation Army.

15      Mother said that she was utilizing the free day care provided by CPS, which would last for six months.

16      Mother said that $139 is taken out of each pay check for child support.

17      Hamilton explained that Mother previously had the appearance of a meth addict and would not have been able to work in customer service; in the past year, she had gotten her teeth fixed, had obtained appropriate clothing, and had kept

her hair combed.

Brager said that if Mother completed paperwork after the protracted day care expired (six months after the case is closed), Mother would go to the top of the list to continue day care as long as she was working.

At the time of the termination trial, Mother had completed one year of her five-year probation term.

Porter–Hodges testified that a child's shots must be up to date; otherwise, the child would not be allowed to stay at the Salvation Army.

This program was also referred to as Community Enrichment.

Ms. Lori testified that she had abused alcohol off and on for approximately twenty years and that she had used some "partying drugs" in her twenties but was never a drug addict.

Ms. Lori said that the Salvation Army offered the program at Cornerstone and that Mother had taken every opportunity that the Salvation Army had offered.

Dustin also said that when Mother was not high, she seemed like a good mother; she seemed like she cared and tried to do what she could for him.

Justin did not identify what Mother had gone to prison for, but he later testified that he knew that Mother had used someone else's credit cards and that she had been convicted for that.

Justin said that he had not been redeemed; he said that he dealt with the pain inside of him by drinking at least three times a week, sometimes to the point of blacking out.

The following testimony contains numerous inconsistencies, reflecting the testimony given before the jury.

Trey did not believe Mother's allegations that his paternal grandfather had sexually molested him because his grandfather had been there for him since he was little. Trey believed that Mother had made up that excuse to explain why she had started using drugs. Trey said that Mother also said that she had started using drugs when he was removed but that was not the truth because she was already using drugs when he was removed.

Trey testified that he had never seen Mother use methamphetamine because she had never used in front of him. He had only seen pipes when Mother and Dustin lived with him.

Trey said that his probation was related to the juvenile matter that happened with Mother.

When asked on cross-examination about his prior testimony that Mother loses patience all the time, he said that examples are Mother's beating him; Mother's getting angry and taking it out on other people; and Mother's screaming, hollering, and cussing.

Trey turned nineteen years old on April 20, 2014.

The record does not contain any records to substantiate Trey's testimony that a CPS case was filed with him as the victim of a beating by Mother in June 2013. The Department's petition reflects that the last CPS case in which physical abuse of Trey was alleged to have been inflicted by Mother was filed in November 2011; the allegation was ruled out.

Trey said that he knew that Father was no longer in possession of the house.

Uncle Intervenor testified that he had known Aunt Intervenor since she was fourteen years old and that they had dated back then.

Uncle Intervenor said that he and Aunt Intervenor lived in a two-story brick house and that G.H. had her own bedroom when she lived with them.

She thought that Aunt Rhonda had asked if G.H. had been to the doctor and to the dentist.

When asked whether she thought it was emotionally damaging for G.H. to be around Joe, Aunt Intervenor said that she had never met Joe.

Father testified that he was a veteran who had served in 1974.

Father admitted that he had several felony convictions, including for burglary, theft, fraud, and one drug offense.

Father testified that he had seen G.H. "quite a few times" since the hearing in February 2014 when G.H. was returned to Mother. He said that a few times he met her at the CPS office, and the rest of the times were at the Salvation Army.

To the extent that Mother argues that the Interveners were required—because they had also pleaded standing under section 102.004(b)—to show satisfactory proof to the court that there is a significant risk of impairment to the child and to obtain leave to intervene, Mother has not cited any case law, nor have we found any, demonstrating why the Intervenors would be required to meet both a general standing requirement and a more specific standing requirement like that found in section 102.004(b). *Compare* Tex. Fam.Code Ann. § 102.003(a), *with id.* § 102.004(b). Nor does section 102.004(b) contain mandatory language requiring the Interveners to meet more than one standing requirement. *See id.* § 102.004(b).

The Department argues that Father did not preserve his legal and factual sufficiency complaints. However, Father timely filed a motion for new trial, challenging both the legal and factual sufficiency of the evidence to support the termination of his parental rights.

Because Mother did not raise a legal sufficiency complaint in the trial court, we overrule the portion of her third issue challenging the legal sufficiency of the best-interest finding and conduct only a factual sufficiency analysis. *See In re D.J.J.,* 178 S.W.3d 424, 426–27 (Tex.App.–Fort Worth 2006, no pet.) (citing *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 220–21 (Tex.1992.); *Cecil v. Smith,* 804 S.W.2d 509, 510–11 (Tex.1991)).

With regard to the allegations that Mother had yelled, hollered, or threatened to slap G.H., we note that these are not grounds for termination. The few instances when this behavior occurred are detailed in the factual section above, and Sara testified that Mother did not actually slap G.H. Moreover, Aunt Rhonda, who transported Mother and G.H. on Saturdays, said that Mother talked to G.H. but did not testify regarding any yelling or hollering or threatening to slap G.H., nor did the other witnesses who had interacted with Mother and G.H. on a weekly basis.

The termination statutes do not require a parent to demonstrate that changes have been maintained for two years or longer. *See* Tex. Fam.Code Ann. § 263.401(b) (West 2014) (providing that the maximum time a termination case can be open is one year and 180 days). As stated in closing, "In a year's time[,] you can only do a year." If the changes that Mother made during the time that she was allowed are ignored simply because they were not maintained for a longer period of time, then every parent who had a child removed by the Department could have her parental rights terminated upon removal, and there would be no need for a service plan.

Because our holding on Mother's third issue is dispositive, we do not address her first or fourth issues. *See* Tex.R.App. P. 47.1 (stating that appellate court need only address every issue necessary for final disposition of the appeal); *In re C.T.E.,* 95 S.W.3d 462, 469 (Tex.App.–Houston [1st Dist.] 2002, pet. denied) (declining to address father's other issues after holding evidence factually insufficient to support best-interest finding).

© 2015 Thomson Reuters. No claim to original U.S. Government Works.